UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerry Lee JOHNSTON, Defendant–
Appellant.

No. 99–10027.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1999

Filed Dec. 21, 1999

Paul Turner, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

David A. Bybee, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

Before: REINHARDT, O'SCANNLAIN, and FLETCHER, Circuit Judges.

REINHARDT, Circuit Judge:

Jerry Lee Johnston appeals his conviction and sentence by the District Court of Nevada for racketeering and conspiracy arising out of fraudulent telemarketing activities in which he participated as an employee of Pioneer Enterprises. On April 23, 1998, Johnston pleaded guilty to one count of racketeering, one count of racketeering conspiracy, and forfeiture pursuant to a plea agreement in which he waived his right to appeal all matters pertaining to the case or sentencing. Three years earlier, Johnston had entered into a similar plea agreement in Michigan, before the U.S. District Court for the Eastern District of Michigan. That earlier plea agreement included a non-prosecution provision.

Johnston raises two principal issues on appeal. First, Johnston appeals his Nevada plea and sentence on the basis of the non-prosecution provision in the earlier Michigan plea agreement. He argues preliminarily that consideration of this claim should not be barred by the non-appealability provision of the Nevada agreement or by his guilty plea, or even by his failure to move for a dismissal of the indictment at the district court level. Then, on the merits, he asserts that the Michigan plea agreement precludes any subsequent prosecutions by the United States. Second, Johnston argues that the Nevada district court erred by not setting off the money forfeited against the restitution ordered. Moreover, Johnston contends on appeal that the non-appealability provision of the Nevada plea agreement does not foreclose appellate review of the second issue.

We conclude with respect to the first issue that the Michigan plea agreement does not bar the subsequent Nevada prosecution. Whether, as the government asserts, this means we have no jurisdiction over that issue is merely a tautological matter. With respect to the second issue, we conclude first, that review of the set-off question is not foreclosed by the non-appealability provision of the plea agreement, and second, that the district court did in

fact err by not providing for a set-off of the money forfeited against the restitution ordered. We thus affirm in part, and reverse in part.

## I.

## BACKGROUND

On April 3, 1995, Jerry Lee Johnston entered a guilty plea to one count of wire fraud and one count of bank fraud, pursuant to a plea agreement reached with the United States Attorney's Office for the Eastern District of Michigan. The counts arose out of Johnston's participation in fraudulent telemarketing groups that promised valuable gifts in return for expensive purchases. Those who bought the various products sold by the group on the strength of the promised prize in fact received "gimme gifts," items of little or no value. From 1988 to 1990, Johnston owned his own telemarketing enterprise in Detroit, Michigan, and the charges included in the Michigan plea agreement stemmed from those activities.

As part of that plea agreement, the "government agree[d] not to charge defendant with any other offenses of which it [was] aware at the time of the signing of this document." However, the agreement also provided that "[u]nless an exception to this paragraph is explicitly set forth elsewhere in this document, *this agreement does not bind or obligate governmental entities other than the United States Attorney's Office for the Eastern District of Michigan*" (emphasis added). Pursuant to the agreement, Johnston was sentenced to nine months in prison, a term of supervised release, a $10,000 fine, and $13,739 in restitution.

On August 28, 1996, a Nevada grand jury filed a criminal indictment against 17 defendants, including Jerry Lee Johnston, in the United States District Court for the District of Nevada. All of the defendants had at one time been associated with Pioneer Enterprises, a telemarketing company located in Las Vegas, Nevada. In particular, Johnston worked for Pioneer Enterprises from 1991 to 1993. As in the earlier Michigan case, the indictment charged the defendants with inducing potential customers to buy their merchandise at inflated prices by fraudulently leading them to believe that they would receive a valuable award in return for their purchases.[1] Johnston himself was indicted on multiple counts of racketeering, racketeering conspiracy, wire fraud, and conspiracy to commit wire fraud. The indictment also demanded forfeiture of at least $142,414.50.[2]

On April 20, 1998, Johnston entered into a plea agreement with the U.S. Attorney's Office for the District of Nevada. In the agreement, Johnston agreed to enter a plea of guilty to one count of racketeering and one count of racketeering conspiracy. As part of the agreement, Johnston consented to forfeiture and restitution. Moreover, the agreement included a waiver of appeal provision, which read: "The defendant is aware that Title 18, United States Code, Section 3742 gives the defendant a right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal *all matters pertaining to this case and any sentence imposed by the Court* provided the sentence is within the guidelines contemplated under this agreement" (emphasis added).

At the hearing on Johnston's motion to change his plea pursuant to the agreement, the judge examined Johnston at length about his mental capacity, his understanding of the plea agreement and its consequences, and the rights he would be waiving in it. The judge also explained

---

1. Pioneer sold vitamins, air and water purifiers, cleaning products, pens and frisbees for prices ranging from $499 to $2,500; the "prizes" victims were told they would receive included a new Cadillac, a sapphire and diamond tennis bracelet, a $2,000 cashier's check, or a big screen television.

2. This amount corresponded to Johnston's salary during the time he worked for Pioneer.

the consequences of his plea to Johnston, spelling out each right which Johnston would give up by entering a guilty plea. In particular, the judge: a) explained that Johnston had a right to appeal; b) explained that he would be "waiving a number of the rights of appeal ..."; and c) directed him to the appeal waiver provision in the agreement.

More specifically, the judge said, by pleading guilty pursuant to the agreement, Johnston would "knowingly waive the right to appeal all matters pertaining to this case and any sentence imposed by the court, provided the sentence is within the guidelines contemplated under this agreement." In particular, the district court told Johnston that to be successful on appeal, Johnston would have to show that the court failed to follow or misapplied the guidelines, or that the court failed to follow a statute that it was required to obey. In addition, the court warned Johnston that, to successfully appeal the guilty plea itself, he would have to show that the plea was either unlawful or involuntary or otherwise "unintelligent."

At the sentencing hearing, the district court explicitly found that the defendant's plea was both voluntary and knowing, and that the plea was supported by an adequate independent basis in fact. Moreover, the court concluded that Johnston fully understood both his rights and the consequences of his plea for those rights. Having reached those conclusions, the court turned to the question of sentencing.

In determining the sentence, the court entertained recommendations and objections from both sides. During the hearing, Johnston's counsel raised both the issues of restitution and of the nonprosecution clause. In particular, counsel argued that any restitution ordered should be set off against the amount forfeited. In setting the sentence, however, the district court noted that restitution is measured by loss to the victims, not profit received by the defendant. Specifically, the court held that it would be inappropriate to deduct the amount forfeited from that allocated for restitution in light of the different purposes and nature of forfeiture and restitution. In particular, the court pointed out that, whereas forfeiture is mandatory and designed to ensure that a defendant does not profit from his crimes, restitution is discretionary and designed to compensate victims for their loss. In setting the appropriate amounts, the court considered Johnston's resources, earning capacity, and financial obligations. The district court ultimately set the amount of restitution at $577,754 and of forfeiture at $142,-414.50.

The issue of the nonprosecution provision in the earlier plea agreement also arose at sentencing, albeit indirectly. In an attempt to argue that Johnston's criminal history did not demonstrate a need for extended incarceration, his counsel referred specifically to the Michigan plea agreement, but appeared to concede that the plea agreement was limited to the Eastern District of Michigan:

When this case first came to fruition in Las Vegas, his prior attorney had moved to get this case dismissed based upon that language in the Michigan plea agreement. However, upon close scrutiny of that plea agreement, the government pointed out to Ms. Pancoast, his prior attorney, that the Michigan plea agreement specifically was limited to the district of Michigan. It's our position that if Mr. Johnston had any idea that the employees of Pioneer were going to be indicted or if his attorney was aware of it, or it [sic] the government had been aware of it, it would have been packaged up together.

Moreover, in arguing for a downward departure under U.S.S.G. § 5K2.0, Johnston's counsel again referred to the plea agreement:

Specifically the plea agreement in that case had indicated that any other offenses which occurred prior to the commission of the Michigan offense would not be prosecuted. This case, the Pio-

neer case, the acts of the Pioneer case to which he pled guilty, occurred prior to the Michigan case. But unfortunately there was also language in the plea agreement which may or may not have been overlooked by Mr. Johnston's attorney, or it just didn't occur to Mr. Johnston that he would be indicted, I think that's probably what happened, that he would be indicted in Las Vegas given the fact that the offenses occurred in '89 through '93, and he wasn't indicted until '96, I think if he had been aware of that then that additional language would have been included in the plea agreement. I think from reviewing the plea agreement it was the intent of all parties that he wouldn't be convicted or he wouldn't be prosecuted for any prior telemarketing activities, and this case was certainly a prior telemarketing activity.

On October 22, 1998, a preliminary order of forfeiture, requiring Johnston to pay the previously established amount of $142,414.50, was filed. In addition, Johnston was required to pay the $577,754.00 that the district court decided should be paid in restitution. Johnston appealed.

## II.

## ANALYSIS

On appeal, Johnston raises two principal issues: first, that the Michigan plea agreement's non-prosecution provision barred his subsequent indictment in federal district court in Nevada; and second, that the amount of restitution should have been set off against the amount forfeited. With respect to the first issue, Johnston ac-

knowledges that, although his lawyer raised the non-prosecution provision as an absolute bar, no motion to dismiss the indictment on that ground was filed. Johnston asserts, however, that he still has the right to raise this issue on appeal because the defect is one he terms "jurisdictional," and thus goes to the question of the government's standing and the district court's ultimate jurisdiction.

With respect to the merits, Johnston attempts to counter the government's argument that the non-prosecution provision in question binds only the U.S. Attorney's Office for the Eastern District of Michigan by citing to cases in which other circuits have considered the scope of non-prosecution agreements; he argues that these cases support the proposition that "*any* attempt to limit the contracting party in a plea agreement to a particular United States Attorney's office is ineffectual" (emphasis added). Johnston does, however, acknowledge that the government's obligation under a non-prosecution agreement can be limited by express language confining its scope either to offenses committed in a particular district, or prosecutions by a particular U.S. Attorney's Office.

■■■ At oral argument, the government acknowledged that if the Michigan plea agreement barred federal prosecution throughout the United States, the issue of the consequences of that agreement *would* be appealable. In short, the government concedes that this is not the type of claim that is barred by a guilty plea, if the claim itself has merit. Thus, as the government put it, we must look at the merits in order to determine the jurisdictional issue.[3] We

---

**3.** Typically, a knowing and intelligent guilty plea forecloses "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett v. Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). The Supreme Court has, however, carved out narrow exceptions to the rule foreclosing appeal of independent claims when the defect in question is a "jurisdictional" one. *See Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40

L.Ed.2d 628 (1974) (holding that where the very initiation of proceedings against the defendant operated to deny him due process of law, a guilty plea could not foreclose an attack upon the subsequent conviction through a habeas petition); *Menna v. New York,* 423 U.S. 61, 96 S.Ct. 241, 46 L.Ed.2d 195 (1975) (holding that a guilty plea did not foreclose the defendant's right to claim a double jeopardy violation). The Court has subsequently limited the scope of those exceptions to in-

do so, and conclude that the Michigan plea agreement is, on its face, effective only as to prosecutions in the Eastern District of Michigan. Accordingly, Johnston's first claim fails either on the merits or, in view of our merits conclusion, because this part of his appeal is barred.

Plea agreements are typically construed according to the principles of contract law. *See United States v. Yemitan,* 70 F.3d 746, 747 (2d Cir.1995). "To determine whether a plea agreement is violated, the court must look to what the parties 'reasonably understood to be the terms of the agreement.'" *United States v. Keller,* 902 F.2d 1391, 1393 (9th Cir. 1990) (quoting *United States v. Read,* 778 F.2d 1437, 1441 (9th Cir.1985)). Typically, the government must bear responsibility for any lack of clarity in those terms. *See United States v. De la Fuente,* 8 F.3d 1333, 1338 (9th Cir.1993). In this case, however, the language is entirely clear. Moreover, that language distinguishes this case from other cases in this circuit and others, in which courts have read non-prosecution provisions in plea agreements broadly to preclude subsequent prosecutions.

In *United States v. Harvey,* 791 F.2d 294 (4th Cir.1986), the Fourth Circuit considered whether a plea agreement made by a U.S. Attorney in one district barred a subsequent prosecution in a related case in another district. The central question was whether the nonprosecution clause by its terms prevented only prosecution in the Eastern District of Virginia, or, more broadly, prosecution by a U.S. Attorney in *any* district. *See id.* at 300. That court found that the plea agreement was ambiguous on this point. It also held that any

ambiguity in such agreements must be construed against the government. *See id.* at 301–02.

As presented, the plea agreement in *Harvey* stated that "[t]he Eastern District of Virginia further agrees not to prosecute Michael Lee Harvey for any other possible violations of criminal law arising from the offenses set out in the indictment or the investigation giving rise to those charges." *Id.* at 296 n. 1. The reference to the Eastern District was construed by the court, in light of other references to the government, as simply indicating the contracting agent for the principal, without limiting the scope of the agreement solely to that agent. *See id.* at 301. No further representations or questions about the parties' specific understanding regarding further prosecution were raised during the hearing. *See id.* at 296. However, as the court noted in its opinion, the lawyer for the government, though never making "any specific representation that she was authorized to bind other districts than her own to abstain from further 'arising from' prosecutions, [did not] ... specifically caution that she had no such authority or that, though she had it, she did not purport to exercise it. To the contrary, in various ways, she manifested an intention ... that the agreement being negotiated was one intended to 'put behind him' all of Harvey's potential liability." *Id.* at 298–99.

Here, as in *Harvey,* the issue is that of the reach of the immunity element of a plea agreement. *See id.* at 295. In *Harvey,* however, the court noted that, although the government at large is bound by plea agreements negotiated by particular U.S. attorneys, the government *can*

---

clude only those claims in which, judged on the face of the indictment and record, the charge in question is one which the state may not constitutionally prosecute. *See United States v. Broce,* 488 U.S. 563, 574–76, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989). What constitutes such a jurisdictional defect, however, is not entirely clear: this circuit has held that such claims are limited to claims

that the statute is facially unconstitutional; or that the indictment failed to state a valid claim; or vindictive prosecution; or possibly selective prosecution. *See United States v. Cortez,* 973 F.2d 764, 766–67 (9th Cir.1992). Because of the government's concession, we need not determine whether a claim that a plea agreement barred further prosecution involves a "jurisdictional defect."

impose temporal or territorial limitations that qualify that obligation. *See id.* at 303.

In *Thomas v. INS*, 35 F.3d 1332 (9th Cir.1994), this court dealt with a similar situation with respect to a cooperation agreement entered into with the United States Attorney. The question was whether the agreement bound the INS. We held that "[t]he promise [in question] expressly bound the government for the particular conduct, and the United States Attorney had actual authority to bind the government." *Id.* at 1335. That agreement, however, involved very different language from the one at hand; in contrast to the agreement in *Harvey*, as well as the one here, it provided that: "the United States of America (hereafter 'Government,' which term includes its departments, officers, agents, and agencies), acting by the Office of the United States Attorney for the District of Colorado, will not prosecute you...." *Id.* at 1335, n. 1.

Although both cases discussed above support the proposition that a plea agreement *can* bind more than just the particular U.S. Attorney's office that entered into the agreement, neither can be read to support the proposition that the plea agreement in this case in fact did so. Specifically, the Michigan plea agreement states that "[u]nless an exception to this paragraph is explicitly set forth elsewhere in this document, *this agreement does not bind or obligate governmental entities other than the United States' Attorney's Office for the Eastern District of Michigan*" (emphasis added). Although at oral argument the defendant argued that the general obligation clause set forth such an exception, we do not agree.[4] This language imposes precisely the sort of territorial limitation that *Harvey* said *would* effectively limit the scope of a plea agreement. Moreover, the language of the plea agreement was in no way modified or amended during the Michigan proceedings.[5] As a result, Johnston's appeal on this point must fail.

With respect to the second issue, namely, the restitution order, Johnston argues that we have jurisdiction to consider his restitution argument on appeal because the restitution determination is not subject to the plea agreement's appeal waiver. On the merits, Johnston asserts that the victims in this case can look to the moneys forfeited to the government as a source of remission for their losses, and that under the relevant provisions of the Victim and Witness Protection Act then in effect (and subsequently abolished),[6] a court cannot impose restitution with respect to a loss

4. Specifically, the defendant makes the argument that an exception is created because the non-prosecution clause appears in a separate section of the Michigan plea agreement and is underlined. The sentence in question reads: *"The government agrees not to charge defendant with any other offenses of which it is aware at the time of the signing of this document."* The term "government," however, is used consistently throughout the plea agreement to refer to the United States Attorney's Office for the Eastern District of Michigan. In fact, the very next sentence of the same section states: *"The government also agrees not to oppose defendant's request that the court recommend halfway house placement."* Thus, the use of the term "government" in a separate section does not create an explicit exception to the general language or usage of the plea agreement. Nor, in light of the immediately following sentence, is the underlining significant. Finally, the content of the non-prosecution clause contains no explicit language stating that "government" means anything other than the U.S. Attorney's Office for the Eastern District of Michigan. Where the plea agreement was intended to apply to more than just the specified U.S. Attorney's Office, it did so explicitly, referring, for example, in the section dealing with the information and assistance required of Johnston as a condition of the plea agreement to "the United States Attorney's office *and to other law enforcement agencies*" (emphasis added).

5. Interestingly, the Nevada plea agreement *was* amended during the plea colloquy by the introduction of a letter from the U.S. Attorney's office in Houston in which the office stated that it had no interest in prosecuting Jerry Lee Johnston.

6. As we note below, Johnston correctly argues that pre–1996 restitution law should be applied.

for which the victim has received or will receive compensation.

With respect to the restitution claim, the government makes three main points. First, the government argues that the claim is barred by the defendant's appeal waiver. Second, the government contends that the restitution claim was not preserved for review, because defense counsel did not object. Third, even if the defendant did in fact preserve the issue for review, the government argues that he has failed to show error. The government bases the third argument on two contentions: first, that nothing in the record suggests that the victims were likely to receive compensation from another source; and second, that Congress did not intend by enacting the VWPA to require restitution amounts to be offset against forfeitures.

The first question, therefore, is whether the issue was either waived or not preserved for review. The second is whether there was in fact error. With respect to the first question, counsel *did* contest the issue, arguing that the court was obligated to set off his restitution claim. Thus, the issue was raised, and thereby preserved for review, if not waived by the plea agreement.

▆▆▆ The more difficult question is whether the plea agreement waiver of appeal rights applies to the restitution order. The relevant provisions in Johnston's plea agreement provide that:

The defendant is aware that Title 18, United States Code, Section 3742 gives the defendant a right to appeal the sentence imposed. Acknowledging this, the defendant knowingly waives the right to appeal all matters pertaining to this case and any sentence imposed by the Court provided the sentence is within the guidelines contemplated under this agreement.

"Generally, courts will enforce a defendant's waiver of his right to appeal if (1) the language of the waiver encompasses the defendant's right to appeal on the grounds claimed on appeal, and (2) the waiver is 'knowingly and voluntarily made.'" *United States v. Martinez,* 143 F.3d 1266, 1270–71 (9th Cir.1998) (citations omitted) (quoting *United States v. DeSantiago–Martinez,* 38 F.3d 394, 395 (9th Cir. 1992)). Moreover, in *United States v. Bolinger,* 940 F.2d 478 (9th Cir.1991), this court held that a defendant cannot circumvent an express waiver of the right to appeal a sentence that falls within the range specified in the plea agreement by alleging misapplication of the sentencing guidelines. This principle, however, does not extend to statutory violations.

In *United States v. Phillips,* 174 F.3d 1074 (9th Cir.1999), we held that a plea agreement waiver of the right to appeal that specifically encompassed the right to order restitution did *not* affect a defendant's ability to appeal issues related to a restitution order.[7] The court in *Phillips* based its decision on two grounds. First, it concluded that because the plea agreement in question was unclear about the precise amount of actual damages, the resulting ambiguity could lead to two different interpretations regarding the amount and manner of calculating restitution; that ambiguity led the court to conclude that the waiver of appeal of the restitution order could not have been knowingly and voluntarily entered into by the defendant. *See id.* at 1076. Second, the court held that a restitution order that exceeded the statutory authority of the VWPA was the equivalent of an illegal sentence, to which a waiver of the right to appeal could not apply. *See id.* In this case, Johnston raises only the second objection. He contends that the waiver does not apply to his restitution claim because the restitution

---

7. In that case, the waiver provision stated that "[y]ou knowingly and voluntarily waive your right to appeal any sentence and restitution order imposed by the Court and the man-

ner in which the Court determines your sentence and restitution order, so long as the sentence is up to a net offense level of 12...." *Id.* at 1075.

ordered was imposed in violation of the VWPA. We agree that, because Johnston asserts a violation of the statute governing the imposition of restitution, his appeal on that claim is not barred.

Johnston argues that because the provisions of the Victim and Witness Protection Act then in effect [8] prohibited the court from imposing restitution with respect to a loss for which the victim has received or is to receive compensation, the district court erred by not considering whether the victims of Pioneer's telemarketing fraud had received or were to receive compensation from other sources. Because victims of RICO crimes can petition for compensation from forfeiture proceeds under 18 U.S.C. § 1963(h)(3), and the regulations promulgated pursuant to it, *see* 28 C.F.R. § 9.1–9.9, Johnston argues that the case must be remanded so that the district court can enter an amended judgment reducing the amount of restitution by the amount forfeited to the government.[9] (Johnston was ordered to pay $142,414.50 in forfeiture, and $577,754.00 in restitution. His counsel specifically asked that the funds forfeited be set off against those to be paid in restitution. The district court, however, refused.)

The language of the VWPA, as of the date pertinent here, was clear: a court had no authority to "impose restitution with respect to a loss for which the victim has received or is to receive compensation."

18 U.S.C. § 3663(e)(1) (1995). The government is correct that the record shows no evidence that the victims were compensated. What the government omits to mention, though, is that the question appears not to have been addressed at all by the district judge.[10] The absence of an answer when the question itself was never asked cannot excuse the initial failure to make the appropriate inquiry.

Under the statute, in its then-existent form, the appropriate procedure required the district court to ensure at the sentencing hearing that there would be no duplication of restitution. At that hearing, the district court was obligated to inquire into *all* possible sources of restitution, including moneys forfeited to the government and those paid in restitution by co-defendants, and to adopt an appropriate procedure for avoiding double compensation. We therefore reverse and remand with respect to the restitution ordered, so that the district court may modify its order so as to take into account any compensation the victims may receive from other sources, whether from funds ordered forfeited under RICO or from other restitution payments.

AFFIRMED IN PART AND REVERSED IN PART.

8. Johnston correctly argues that under *United States v. Baggett*, 125 F.3d 1319 (9th Cir. 1997), the unamended version of the VWPA applies.

9. In *United States v. Salcedo–Lopez*, 907 F.2d 97 (9th Cir.1990), this court held that the provisions of the VWPA were not part of a forfeiture statute. Rather, the statute exists to compensate victims for a loss. Where no such loss exists, the government cannot use the statute to ensure that a defendant does not profit from his crimes. *See id.* Here, however, the loss is both real and substantial.

Moreover, the statute makes explicit provision for set-offs, but states that restitution shall be set off against compensatory damages

in federal or state civil proceedings. *See* 18 U.S.C. § 3663(e)(2) (1995). The question then is whether the explicit mention of set-off with respect to compensatory damages in civil proceedings limits means that set-offs with respect to forfeited funds are precluded. Again, the plain language of the principal provision would suggest that they are not.

10. Jerry Lee Johnston pled guilty as part of a global plea agreement encompassing multiple defendants, many of whom had already been ordered to pay restitution. Many of those defendants worked with or supervised Johnston in closing sales. Thus, there would appear to be some logical overlap between the various restitution orders. The district court, however, did not address this issue.