**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Dennis BRIGHT, Defendant–Appellant.**

No. 02–50492.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 9, 2003.

Filed Jan. 5, 2004.

H. Dean Steward, Capistrano Beach, CA, for the defendant-appellant.

Edward R. McGah, Jr., Executive Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before: FISHER and BYBEE, Circuit Judges, and MAHAN, District Judge.*

FISHER, Circuit Judge:

Appellant Dennis Bright pled guilty to five counts of mail fraud arising of a scheme in which Bright falsely offered nurses the opportunity to work at home processing medical surveys. Bright now appeals his sentence, claiming that the district court improperly calculated the amount of his victims' total losses, resulting in a 10–level rather than a 9–level adjustment of his base offense. Bright also challenges the district court's restitution order, arguing that the court improperly ordered restitution for dismissed counts and that the court should have made forfeited funds available for restitution.

We conclude that the district did not err in calculating the total loss or in ordering restitution for dismissed counts. We also hold that the district court was not required to attempt to transfer forfeited funds to Bright's victims. Therefore, we affirm the district court.

### I.

Beginning in July 1997, Bright, a registered nurse, owned and operated five busi-

---

* The Honorable James C. Mahan, United States District Judge for the District of Nevada, sitting by designation.

nesses that purported to offer nurses the opportunity to earn extra income by processing medical surveys out of their homes. Bright sent letters to nurses throughout the United States, representing that (1) one of his five companies would pay the nurses between $20 and $45 for each survey processed; (2) the surveys would come directly from the company; (3) participating nurses would have to sell nothing; and (4) the companies were conducting a medically supervised clinical trial. Codefendant Stephen Chandler assisted Bright in operating the companies and in carrying out the mail order scheme. Nurses who chose to participate in Bright's work-at-home programs paid a registration fee of approximately $65. Upon receipt of the fee, Bright would send letters to the nurses advising them that they would have to post signs soliciting customers for a weight-loss product that Bright was selling. The nurses would be paid only if customers purchased the weight-loss products from Bright. The medical surveys to be processed by the nurses would come from people who purchased the weight loss products—not directly from Bright's companies, as stated in the initial solicitation letter. Moreover, none of the five companies was conducting a medically supervised clinical trial. In response to the solicitations, Bright's companies received a total of $641,999 in registration fees.

In October 1998, federal agents investigating Bright's mail order businesses searched Bright's home and seized $72,402 in cash. Agents also seized $13,792.60 from the bank account of one of Bright's companies. The United States Postal Inspection Service subsequently forfeited the $86,194.60 in seized funds.

In March 2001, Bright was indicted on 14 counts of mail fraud and nine counts of money laundering. A superseding indictment narrowed the charges to the 14 counts of mail fraud. Bright pled guilty without a plea agreement to five counts of the indictment, under 18 U.S.C. § 1341.

Bright's presentence report recommended a base offense level of 6. The presentence report valued the total amount of loss at $641,999. Accordingly, the report recommended a 10–level enhancement under United States Sentencing Guidelines § 2F1.1(b)(1)(K) (2000), for an offense involving victim loss of more than $500,000. Other adjustments not at issue here brought Bright's total offense level to 20.

At sentencing, the district court deducted $4,333 that Bright had paid to victims for completed surveys from the total amount of loss. Bright asked the court to make further deductions for (1) refunds paid to the victims, (2) victim payments allegedly diverted by Chandler for his own personal use and (3) the $86,194 seized by the Postal Inspection Service. The court refused. Because the deduction for the completed surveys was not enough to bring the victim loss below $500,000, the district court imposed the 10–level adjustment under § 2F1.1(b)(1)(K), resulting in a total offense level of 20. The court then granted Bright's request for a downward departure, reduced his offense level to 18 and imposed a low-end sentence of 27 months.

The district court ordered Bright to pay a fine of $6,000, a $500 special assessment and $15,188 in restitution. Before doing so, the court asked the prosecutor about the availability of the forfeited funds, but was informed that they were not available for restitution.

## II.

Bright contends that the district court erred by failing to make three deductions from its calculation of a total victim loss of $637,666: (1) approximately $30,000 in cus-

tomer refunds, (2) approximately $25,000 of program funds that codefendant Chandler allegedly stole without Bright's knowledge and (3) the $86,194 in seized funds. If these funds were deducted, the total loss would be approximately $496,000, which would result in only a 9–level enhancement for amount of loss, rather than the 10–level enhancement the district court applied. U.S.S.G. § 2F1.1(b)(1)(J). The total amount of loss will not fall below $500,-000—and thus Bright's offense level will not change—unless we conclude that the district court erred in refusing to make each one of the three proposed deductions.

We review for clear error the district court's factual findings with respect to monetary loss to victims. *See United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir.1999). Findings of fact must be supported by a preponderance of the evidence. *Id.* We review de novo the district court's interpretation of the Sentencing Guidelines. *See United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1049 (9th Cir.2003).

### A.

A fraud defendant is entitled to credit for refunds paid prior to the discovery of the offense. *United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir.1998) (applying the "economic reality approach" of *United States v. Allison*, 86 F.3d 940, 943–44 (9th Cir.1996)). *Stoddard* concerned the defendant's misappropriation of escrow funds at a bank. There, we held that the offense was discovered when the bank's chief financial officer notified Stoddard of discrepancies in his escrow accounts, resulting from Stoddard's illicit activity. Accordingly, we refused to credit against the actual loss calculation the escrow repayments Stoddard made after that discovery. *Id.* at 1146. "Repayments before detection show an untainted intent to reduce any loss," whereas "[r]epay-

ments after detection may show no more than an effort to reduce accountability." *Id.; see also United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir.1998) (refusing to deduct refunded amounts from calculation of loss because refunds were paid to avoid detection and to "mak[e] the operation look legitimate").

Here, Bright paid refunds to certain nurses who discovered his fraud and wrote to him demanding their money back. Bright claims that he is entitled to credit for such refunds because he paid them before his crimes were *detected by law enforcement.* Bright also claims that there is insufficient evidence in the record that he paid refunds to escape detection. But *Stoddard* held that a defendant is not entitled to credit for refunds paid after *detection by a victim*, regardless of any evidence that the refunds were in fact paid to avoid detection by law enforcement. Therefore, even if Bright were correct that there is insufficient evidence regarding his motive for paying the refunds, the district court did not err in refusing to deduct the refunded amounts from its calculation of total loss.

### B.

The district court also did not err in refusing to deduct from the total loss amount the $25,000 that Chandler allegedly stole. Bright was not aware of these funds or of the specific nurses who supplied them. However, the sentencing guidelines provide that a defendant shall be held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of [ ] jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (2000).

Chandler, who pled guilty to three counts of mail fraud arising out of his role in the scheme, plainly was involved in a

jointly undertaken criminal activity with Bright. According to the presentence report, Chandler helped Bright operate several of the companies. At Bright's direction, Chandler filed fictitious business name statements, opened bank accounts and made deposits, retrieved mail from commercial mail drops, assisted with the mailing of solicitation letters and supervised the activities of other participants in the scheme. Moreover, the money Chandler allegedly misappropriated came from nurse-victims of this jointly undertaken scheme.

It is reasonably foreseeable that a participant in a jointly undertaken criminal venture may obtain funds from the targets of that venture. Here, Chandler allegedly siphoned off $25,000 through his and Bright's fraudulent scheme. That Chandler may not have shared this money with Bright or told Bright which victims supplied it does not mean that Chandler was involved in a separate venture. *See Blitz,* 151 F.3d at 1012–13 (holding telemarketer defendants responsible under § 1B1.3 for losses caused to other victims by other telemarketers in defendants' fraudulent company). The district court, therefore, properly refused to deduct the amounts that Chandler allegedly diverted to himself, even if Bright was unaware of those funds.

### C.

Finally, the district court did not err in refusing to deduct from the total loss amount the $86,194 the federal agents initially seized and later forfeited. Although the civil forfeiture deprived Bright of his ill-gotten gain, in making "a reasonable estimate of the loss"—which is all that the

guidelines require, *see* U.S.S.G. § 2F1.1, Application Note 9—the district court is not obliged to measure the loss by the gain to the defendant. *See United States v. Sayakhom,* 186 F.3d 928, 946 (9th Cir. 1999). Instead, the district court may calculate loss "as the value of money unlawfully taken." *Id.*

■ Bright does not dispute that he unlawfully took the seized funds from the victims; nor does he claim that any seized funds have been restored to the victims. That the government "recovered" the funds through seizure and forfeiture does not mean that the victims never lost them. Moreover, Bright has offered no authority for the proposition that funds the government seizes must be (or can be) deducted from the court's loss calculation.[1] Indeed, even if the money were eventually restored to the victims, reducing Bright's loss calculation by the amount seized would distort the magnitude of his crime. If refunds paid voluntarily by a defendant after discovery of the offense cannot be credited against total loss, then surely amounts recovered from the defendant through the involuntary forfeiture of fraud proceeds cannot be credited against loss. Accordingly, the district court properly refused to deduct the seized funds from its calculation of total loss.

In sum, the district court made no errors that, together or separately, would cause Bright's total loss calculation to fall below $500,000. The court correctly calculated Bright's offense level.

### III.

The district court ordered Bright to pay restitution pursuant to the Mandatory Vic-

---

1. Bright asserts that Application Note 8(a) of U.S.S.G. § 2F1.1 (2000) supports his argument. But that note merely provides that when a defendant fraudulently misrepresents the value of an item, loss is measured by the difference between the amount the victim paid and the amount for which the victim could resell the item. The note is relevant only when the victim's expenditures are offset in part by value inherently conferred upon the victim as part of the defendant's scheme-not the case here.

tims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A (2000). Bright does not contest the applicability of the MVRA to his crime. He challenges the restitution order on two grounds. First, he claims that the amount of restitution imposed was excessive because the court was authorized to order restitution only for the counts of conviction. Second, Bright contends that the district court improperly failed to offset his forfeited funds against his restitution obligation, or at least should have ordered the government to return those funds to Bright's victims.

### A.

■ Instead of basing restitution only on the losses caused by the specific counts of conviction, the district court included losses relating to both the counts of conviction and the dismissed counts, which involved numerous additional victims. Accordingly, although the losses caused by the counts to which Bright pled guilty totaled only $331, he was ordered to pay more than $15,000 in restitution. Bright did not challenge the amount of the restitution order before the district court, so we review his first claim for plain error. *See United States v. Jackson*, 229 F.3d 1223, 1225 (9th Cir.2000).

■ As Bright conceded at oral argument, the MVRA authorizes orders of restitution for losses caused by "related but uncharged conduct that is part of a mail fraud scheme." *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003). The district court in *Grice* found the defendant's "*crimes* to be part of a long-standing scheme." *Id.* at 1176(emphasis added). *Grice* recognized that a scheme to defraud is in fact one of the elements of mail fraud, and that by pleading guilty to four counts of mail fraud, the defendant admitted her involvement in a scheme. *Id.* at 1178.

Here, Bright similarly pled guilty to multiple counts of mail fraud, thus ac-

knowledging his participation in a scheme to defraud. The district court therefore properly ordered restitution for losses caused by the dismissed conduct related to this scheme. *Id.* at 1177.

### B.

■ The MVRA makes restitution mandatory for certain offenses involving fraud, including Bright's mail fraud. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii) (2000). Bright claims that the district court should have offset his restitution obligation by the amount of funds the government seized from his house and bank account and ultimately forfeited. Although the district court did not make such an offset, the court did ask the prosecutor about the status of the forfeited funds and whether they were "segregated for restitution purposes." The prosecutor replied that the funds would have gone into the "Postal Service general pot" and were apparently not, in any event, available for restitution to Bright's victims. Bright contends that this inquiry was insufficient because the court was obligated to seek out the funds and order that they be transferred to Bright's victims. Bright's arguments require us to evaluate the extent of the district court's obligations in fashioning restitution, a legal question that we review de novo. *See United States v. Stanley*, 309 F.3d 611, 613(9th Cir.2002). We conclude that under the MVRA the district court could not have reduced or offset Bright's obligation-certainly not for forfeited funds not paid over to his victims; nor was the court required to pursue those funds, even though it may have had discretion to do so.

### 1.

We first examine the MVRA's statutory framework, and in particular provisions that address the relationship between restitution orders and various other sources of compensation for victims. Before Con-

gress passed the MVRA, restitution would have been discretionary in a case like this, under the Victim and Witness Protection Act of 1982 ("VWPA") § 5(a), 18 U.S.C. § 3663(a) (West 1985). The MVRA, however, created a mandatory category of restitution for specified crimes, and also amended the VWPA in certain respects. Under the pre MVRA version of the VWPA, district courts had no authority to "impose restitution with respect to a loss for which the victim has received or is to receive compensation." 18 U.S.C. 3663(e)(1) (1995). Moreover, in setting the amount of a defendant's restitution obligation a district court was required to "consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and *such other factors as the court deem [ed] appropriate.*" *Id.* § 3664(a) (emphasis added).

In passing the MVRA in 1996, Congress modified the manner in which a district court is to fashion restitution orders and significantly limited the court's discretion in setting the amount of such restitution. First, the MVRA created 18 U.S.C.

§ 3663A,[2] which makes restitution mandatory for certain crimes, including mail fraud. Second, the MVRA amended VWPA's key section, § 3663. After these amendments, the VWPA still provides for discretionary orders of restitution for several crimes not covered by the MVRA, but now with different constraints. Significantly, § 3663 no longer prohibits courts from ordering restitution for a loss for which the victim has received or is entitled to receive compensation.

Third, the MVRA modified § 3664. The previous version of that section set forth the procedure for issuing and enforcing restitution orders under the VWPA. The modified version now applies to restitution orders under the new MVRA and the revamped VWPA. *See* §§ 3663(d), 3663A(d). In its current form, § 3664 directs the court to order restitution of the full amount of a victim's loss without regard to the defendant's economic circumstances and—echoing VWPA § 3663—*without regard to other sources of compensation for the victims.* Any such offsets are instead to be handled separately as potential credits against the defendant's restitution obligation—not as reductions in the amount of that obligation in the first instance.[3]

**2.** All subsequent citations to the post-MVRA restitution provisions refer to Title 18 of the U.S.Code, unless otherwise indicated.

**3.** The relevant portions of 18 U.S.C. § 3664 are:

(f)(1)(A) In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant.

(B) In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution.

(2) Upon determination of the amount of restitution owed to each victim, the court shall, pursuant to section 3572, specify in

the restitution order the manner in which, and the schedule according to which, the restitution is to be paid, in consideration of—

(A) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant; including obligations to dependents.

* * * *

(j)(1) If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before

Specifically, § 3664 provides that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." § 3664(f)(1)(A). The defendant's economic circumstances factor in only in fashioning the manner of and schedule for paying restitution. *See* § 3664(f)(2). Further, although the MVRA does not mention the relationship between restitution and forfeited funds specifically, it does address the relationship between restitution and other sources of funds in general: "In no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance *or any other source* be considered *in determining the amount of restitution.*" § 3664(f)(1)(B) (emphasis added). Thus it is clear from the plain language of the statute that the district court was required in the first instance to set the amount of Bright's restitution obligation based on his victims' collective losses and without regard to forfeited funds—whether or not any of those funds had been turned over to the victims. The question then is, was the district court thereafter required to credit the forfeited funds against that restitution obligation?

Again, although the MVRA does not specifically mention forfeited funds, at least two provisions are particularly relevant to the issue of offsets. First, if at the time of the restitution order:

a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that

restitution be paid to the person who provided or is obligated to provide the compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

§ 3664(j)(1). Even assuming this proviso would encompass forfeited funds, by its terms it would not apply here, because none of Bright's victims have received "compensation" from this "other source." Even if they had, Bright would not get an offset, because the government would step into the victims' shoes as a subrogee of their restitution claims against Bright.[4]

Second, "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in" any federal or state "civil proceeding." § 3664(j)(2). This section does not help Bright either. First, it "only comes into play after the district court has already ordered restitution in the full amount of the victim's loss." *United States v. Alalade*, 204 F.3d 536, 540 n. 4 (4th Cir.2000) (citing *United States v. Crawford*, 169 F.3d 590, 593 (9th Cir. 1999)). Second, even assuming the government's forfeiture of Bright's funds could be construed as "compensatory damages" within the scope of § 3664(j)(2), again those funds have not been transferred to any of the victims here.

Thus, whatever offsets might be due when a defendant's funds have been forfeited and paid to the victims—an issue we

any restitution is paid to such a provider of compensation.

(2) Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in—

(A) any Federal civil proceeding;  and

(B) any State civil proceeding, to the extent provided by the law of the State.

4.  *Cf.* § 3664(g)(2)(providing that a victim may assign her interest in restitution (ordered under either the MVRA or VWPA) to the Crime Victims Fund in the Treasury without impairing the defendant's obligation to make restitution payments).

do not decide—the MVRA provisions above make clear that funds the victims have *not* received cannot reduce or offset the amount of losses the defendant is required to repay. We agree with the Fourth Circuit that:

> If the MVRA prohibits district courts from reducing the amount of restitution by the amount of third-party compensation received by a victim prior to entry of the district court's order of restitution, it would be nonsensical for the district court to have discretion to reduce the amount of restitution by the value of property seized from the defendant and retained by the government in administrative forfeiture, a loss to the defendant.

*Alalade,* 204 F.3d at 540.[5] As to crimes covered by the MVRA, therefore, the MVRA has eliminated whatever discretion district courts previously had under the VWPA to include offsets for forfeited funds that have not been restored to victims.[6] Accordingly, the district court did not err in rejecting Bright's requested offset here.

### 2.

Bright makes two separate arguments for the proposition that the district court should have attempted to make the funds forfeited by the Postal Inspection Service available for restitution. First, Bright invokes our decision in *United States v. Johnston,* 199 F.3d 1015 (9th Cir.1999), which involved a restitution order entered following Johnston's conviction for RICO violations. Victims of RICO violations can petition for compensation from forfeiture proceeds. *Id.* at 1023; *see* 18 U.S.C. § 1963(h)(3); 28 C.F.R. § 9.1–9.9. We held that "the district court was obligated to inquire into *all* possible sources of restitution, including moneys forfeited to the government … and to adopt an appropriate procedure for avoiding double compensation." *Johnston,* 199 F.3d at 1023. The record in *Johnston* was silent as to whether the victims had already received compensation from the forfeited funds. Moreover, restitution had been ordered under the pre-MVRA version of the VWPA, so we relied on the VWPA's "then-existent" rule that "a court had no authority to 'impose restitution with respect to a loss for which the victim has received or is to receive compensation.'" *Id.* (quoting 18 U.S.C. § 3663(e)(1) (1995)). Under those circumstances, we held that the district court was required to inquire further "to ensure … that there would be no duplication of restitution." 199 F.3d at 1023.

Bright's circumstances are materially different. Foremost, the MVRA deleted the VWPA provision upon which *Johnston* relied. Furthermore, whereas RICO and implementing regulations authorize RICO victims to petition for restitution, no comparable provision authorizes Bright's victims to petition the Postal Service for restitution. Rather, under the Civil Asset

---

5. The *Alalade* court further noted:

> [W]e need not decide, and we express no opinion on, the effect upon the district court's calculation of the full amount of a victim's loss under the MVRA when the victim receives property or cash from the Department of Justice through its remittance program involving property or cash seized by the government in administrative forfeiture in connection with the case.

*Alalade,* 204 F.3d at 541 n. 5.

6. We have previously held that district courts are not constitutionally required to credit forfeited funds toward restitution. In *United States v. Feldman,* 853 F.2d 648, 663–64 (9th Cir.1988), we held that the district court did not violate the Eighth Amendment by ordering forfeiture of $1,986,990 under the RICO statute as well as imposing restitution in the same amount under the Federal Probation Act, 18 U.S.C. § 3651 (1982), as a condition of probation on mail fraud counts.

Forfeiture Reform Act of 2000 ("CAFRA"), Pub.L. No. 106–185, 114 Stat. 202 (2000), the Postal Service has *discretion* to transfer forfeited funds "as restoration to any victim of the offense giving rise to the forfeiture." 18 U.S.C. § 981(e)(6) (West Supp.2003). As noted above, the Service has not chosen to transfer the forfeited funds, so the double-recovery problem that motivated *Johnston* is not present here.

■ Bright's second argument is that the district court's Article III powers obligated it to order that the forfeited funds be applied toward restitution. He cites *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (holding that Federal Water Pollution Control Act did not rob district court of power "to order that relief it considers necessary to secure prompt compliance with the Act"), for the proposition that a district court may order the relief it considers necessary to secure prompt compliance with the law. Bright's argument fails, however, unless he can show some legal right or obligation that the district court derogated by failing to attempt a transfer of the forfeited funds from the Postal Service to Bright's victims. *See Spurlock v. F.B.I.*, 69 F.3d 1010, 1017 (9th Cir.1995) ("[I]f a right of action exists to enforce a federal right *and Congress is silent on the question of remedies*, a federal court *may* order any appropriate relief.") (internal quotation marks omitted) (second emphasis added); *United States v. Coca–Cola Bottling Co. of L.A.*, 575 F.2d 222, 228 (9th Cir.1978) ("[W]hen equity jurisdiction has been invoked to enforce federal statutory prohibitions, the Su-

preme Court repeatedly has recognized the power of the equity court to mold the necessary decrees to give effect to congressional policy.").[7] Here, CAFRA and the MVRA are the two possible sources for creating such a right or obligation. Neither does so.

First, as noted, CAFRA leaves to the Postal Service's discretion whether to retain forfeited funds or transfer them to victims. 18 U.S.C. § 981(e). Requiring district courts to attempt to apply forfeited funds toward restitution would not carry out CAFRA's mandate, but rather, would conflict with the grant of discretion CAFRA expressly and specifically gives to the Postal Service.[8] Second, as we have already reviewed, the MVRA instructs district courts on how they must calculate restitution when funds are made available to the victims from other sources and significantly restricts the circumstances in which a district court may offset other funds against the amount of a restitution order. *See* §§ 3664(f)(1)(B), (j)(1), (j)(2). Nothing in the MVRA indicates that district courts themselves are required to reach out and order the government to transfer forfeited funds from government entities to victims. If anything, there is some indication to the contrary. *See* § 3664(p) (no restitution provision "shall be construed to create a cause of action not otherwise authorized in favor of any person against the United States or any officer or employee of the United States."). Thus, there is no legal obligation that would compel the district court to invoke its Article III enforcement authority.

---

7. As these cases indicate, even when federal courts are permitted to exercise their equitable powers under Article III, they usually retain discretion in deciding whether and how to do so.

8. Under pre-CAFRA provisions, the Postal Service could restore forfeited property only

to the victims of specified offenses. *See* 18 U.S.C. § 981(e)(6) (2000). For victims of mail fraud—the crime for which Bright was convicted, *see* 18 U.S.C. § 1341—the Postal Service could restore forfeited funds to victims only if the crime "affect[ed] a financial institution." 18 U.S.C. § 981(a)(1)(C) (2000). 105

CAFRA and the MVRA do not, of course, prevent district courts when fashioning restitution orders from urging the government to consider possible sources of funds to reimburse victims. Indeed, nothing we say here is intended to discourage them from doing so. In this case, for example, the district court asked the prosecutor about the forfeited funds and learned that they were apparently not available for restitution. Although CAFRA and the MVRA evince Congress' concern that crime victims receive appropriate restitution, neither statute mandates the transfer of forfeited funds to victims. Accordingly, we reject Bright's claim that Article III required the district court to seek out funds held by the Postal Service and transfer them to Bright's victims.

### IV.

The district court properly refused to reduce the amount of total loss by the amounts paid as refunds, the funds stolen by Chandler and the funds seized by the government. Moreover, the court appropriately ordered restitution for losses caused by conduct that was the subject of dismissed counts and did not err in failing to transfer (or attempt to transfer) forfeited funds to Bright's victims. Accordingly, we affirm the district court's sentence and its order of restitution under the MVRA.

**AFFIRMED.**