**UNITED STATES of America,**

v.

**Francis Richard STEWART, Defendant.**

**No. CRIM. PJM 03–05.**

United States District Court, D. Maryland.

May 28, 2004.

---

Stuwart A. Berman, Barbara S. Skalla, Greenbelt, MD, for Plaintiffs.

Edward Charles Sussman, Washington, D.C., for Defendants.

## *OPINION*

MESSITTE, District Judge.

### I.

Francis Richard Stewart, the spouse of a deceased federal employee, pleaded guilty to a single count of conspiracy to defraud the United States, specifically conspiracy to convert survivor benefits from the Office of Personnel Management (OPM), in violation of 18 U.S.C. § 371. The payments made to or on behalf of Stewart between 1998 and 2002 consisted of:

- $382,560 in Non–Recurring Payment Actions (NRPA's), less $84,858.65 in federal and $6,710.00 in state taxes withheld by OPM, a net of $290,991.35;

- $63,995 in monthly annuity payments, less $130 in federal and $130 in state taxes withheld by OPM, a net of $63,735; and

- $109,995.85 in prescription drug and medical benefits.

Except for certain tax withholdings OPM "recovered" for calendar year 2002,[1] the Government contends that the Court should order restitution in the full amount of the payments allocated to Stewart, including all other federal and state taxes withheld by OPM. The gross amount

---

1. OPM was apparently able to recover $10,100 in federal and $5,010 in state tax withholdings in connection with payments made to Stewart for calendar year 2002. Accordingly, the Government only seeks to include in the restitution order the balance of federal taxes, $74,888.65 [($84,858.65—10,100) + 130 = $74,888.65] and the balance of state taxes withheld, $1,830.00 [($6,710—5,010) + 130 = $1,830.00].

which the Government seeks is $541,440.95.[2] Stewart argues that inclusion of the federal taxes withheld and paid by OPM would result in a double recovery to the Government and for that reason should be excluded.[3]

The Court agrees with Stewart.[4]

## II.

The Civil Service Retirement System ("CSRS") covers most federal employees hired prior to 1984.[5] The enabling legislation for the system provides, in pertinent part, that "[t]he employing agency shall deduct and withhold from the basic pay of an employee ... the percentage of basic pay applicable [as set forth elsewhere in the statute]. An equal amount shall be contributed from the appropriation or fund used to pay the employee...." 5 U.S.C. § 8334(a)(1) (2003). Once the funds have been withheld, "[t]he amounts so deducted and withheld, together with the amounts so contributed, shall be deposited in the Treasury of the United States to the credit of the Fund under such procedures as the Secretary of the Treasury may prescribe." § 8334(a)(2). "The Fund" refers to the Civil Service Retirement and Disability Fund, as described in 5 U.S.C. § 8348. The Fund is drawn upon for the payment of benefits and administrative expenses. § 8348(a)(1)(A) & (B). This provision also directs that the "Secretary [of the Treasury] shall immediately invest in interest-bearing securities of the United States such currently available portions of the Fund as are not immediately required for payments from the Fund. The income de-

2. [($382,560—15,110) + 63,995 + 109,-995.95 = $541,440.95].

3. Stewart appears to have abandoned his claim for exclusion of the state taxes withheld. But the Court would not be inclined to accept the argument as to tax withholding paid over to the state authorities in any event. Such payments left the Federal Treasury and went into the State of Maryland's coffers unlike, as will be seen, the federal tax withholdings which were merely credited by the U.S. Treasury to a general revenue account within the Treasury as opposed to the separate account of the CSRS. The disruption to fiscal planning of the State, assuming the Federal Government could bring an action to recover state taxes mistakenly withheld and remitted by it, would certainly be greater than the disruption to the Federal Government if the mistakenly paid federal withholdings were simply credited by the U.S. Treasury back to the CSRS. *See Dobbs, Law of Remedies,* § 4.9(3) (2d ed.1993).

4. The Court does not, however, find that the "loss" for purposes of calculating Stewart's offense level under the Sentencing Guidelines should exclude the federal tax withholdings.

The plea agreement left open one disputed sentencing guidelines issue: whether there should be a 14–level increase in the offense level under § 2B1.1(b)(1)(H) because the loss to the federal retirement system attributable to Stewart was more than $400,000, but not more than $1,000,000, or a 12–level increase under § 2B1.1(b)(1)(G) because the loss was less than $400,000. Stewart argued for a lesser loss based upon the exclusion of: payments made prior to his knowledge of the fraud; payments diverted without his knowledge to his daughter, a co-defendant; costs for medical benefits; and amounts paid in federal and state taxes. At sentencing, the Court denied reductions on all grounds other than the tax payments, which are the subject of the present Opinion.

As to deductions for taxes paid but not recovered by OPM, the commentary to USSG § 2B1.1 sets forth familiar principles governing the calculation of loss in fraud cases. The general rule is that "loss is the greater of actual loss or intended loss." § 2B1.1, comment. (n. 3(A)). Here there is no question that the loss "intended" by Stewart was the gross payments allocated to him by OPM, taxes included. In any case, subtracting the federal taxes withheld, $74,888.65, from the gross payment of $541,440.95, would still result in a loss in excess of $400,000. Stewart's guideline score, therefore, would be unaffected.

5. Stewart's spouse was hired prior to 1984.

rived from these investments constitutes a part of the Fund." § 8348(c). "The obligations issued for purchase by the Fund shall have maturities fixed with due regard for the needs of the Fund...." § 8348(d). The statute also sets forth reporting requirements by the OPM to the Treasury Secretary, § 8348(g), as well as additional rules governing the Secretary's discretion to "sell or redeem securities, obligations, or other invested assets of the Fund...." § 8348(k).

Among other payments, OPM makes Non–Recurring Payments (NRPAs) to annuitants, which represent either retroactive benefits due the annuitant or serve to adjust regular annuity benefits. In connection with these payments, OPM withholds for federal and state taxes, remitting the former to the Internal Revenue Service and the latter to the appropriate state taxing authority. The Government submits, without citing authority, that once the tax withholdings are paid over to the federal and state taxing authorities, they cannot be recouped.

### III.

The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A (2003), provides that the district court "shall order, in addition to ... any other penalty authorized by law, that the defendant make restitution to the victim of the offense...." § 3663A(a)(1). The statute applies to any "offense against property under [Title 18], ... including any offense committed by fraud or deceit...." § 3663A(c)(1)(A)(ii). Title 18 U.S.C. § 3664 (2000), which governs restitution orders, requires the court to "order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." § 3664(f)(1)(A); *United States v. Dawkins,* 202 F.3d 711, 715–716

(4th Cir.2000). Additionally, the court may not consider any compensation the victim has received from insurance or any other source in determining the amount of restitution. § 3664(f)(1)(B). The statute contains a limited offset provision, requiring reduction of the restitution amount to take into account any amount later recovered as compensatory damages for the same loss by the victim in any federal or state civil proceeding. § 3664(j)(2). Because Stewart does not possess the funds which were paid to him, the most applicable statutory provision to determined the appropriate restitution amount is "the value of the property on the date of the damage, loss, or destruction...." § 3663A(b)(1)(B)(i)(I).

Under the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered...." § 3663A(a)(2). The Government argues that the victim of Stewart's fraud is the CSRS Fund. Stewart concedes that the U.S. Government was the victim of his actions, but disputes that one particular agency of the Government (the CSRS) can be a victim of the loss, while another agency of the same Government (the U.S. Treasury) ends up with the "lost" funds. He notes that CSRS invests in U.S. Treasury obligations and that interest on those obligations is paid from general revenues. Further, says Stewart, the Secretary of the Treasury apparently enjoys discretion in the investment of the Fund's resources. It is therefore unreasonable, he argues, to suggest that "because the federal government does not keep all its money in one pocket that every separate government fund or entity is an individual victim."

### IV.

█ The Court agrees that Stewart should receive a credit against the order of

restitution for any and all amounts that OPM withheld and paid to the U.S. Treasury relative to Stewart's federal income taxes.

The Court accepts the parties' formulation of the key issue: whether the "victim" of Stewart's fraud or deceit was the CSRS or the U.S. Government as a whole.

Clearly CSRS was a "victim" if one assumes that the payments it made to the Treasury have been irretrievably lost to it, *i.e.* if the Fund has been effectively depleted by the amount of those payments. Insofar as those payments are concerned, however, the Government as a whole has hardly suffered. Instead of remaining in the account especially designated for civil service retirees, the payments went into the Treasury's general revenue fund where they were available to finance other government spending.[6] This appears to be little more than an accounting matter. The Court cannot conceive why payments mistakenly made (or, more precisely, payments made under false pretenses) by one government agency to another cannot simply be credited back to that agency's account by the Treasury out of the general revenue fund. A taxpayer who mistakenly overpays his taxes may file for a refund. Internal Revenue Code, 26 U.S.C. § 6402 (2002). Why not a governmental agency? If the Government chooses to characterize the CSRS as the "victim" of the fraud or deceit, nothing would seem to prevent it from treating the CSRS as such and restoring the funds. Any other outcome would result in a windfall for the Government.

■ It is true under 18 U.S.C. § 3664(f)(1)(B) that, in determining restitution, a defendant gets no credit for payments made to a victim by reason of insurance "or any other source." (2003). But that is nothing more than a statement of the collateral source rule applicable in tort cases, *i.e.* that, for policy reasons, a tortfeasor is not permitted to benefit from the special arrangements that an insured victim may have made with outside sources to protect himself. *See e.g., Narayen v. Bailey,* 130 Md.App. 458, 747 A.2d 195, 199–200 (2000). Here there is no issue of collateral source; the Government always had use of the withheld federal taxes and to that extent it was never injured.

The Government invites the Court's attention to *United States v. Alalade,* 204

---

6. "Trust fund programs differ in a number of ways from other government programs." Many trust fund programs, including Social Security and Medicare, have distinct revenue authorities to finance, or help finance, the benefits that they provide or functions that they serve. And that income, when received by the Treasury, is accounted for by crediting federal securities to the trust fund accounts. Notably, those securities represent the government's promise to pay money to itself.

\* \* \* \* \* \*

The receipts themselves are deposited in the Treasury, and program expenditures are made from the Treasury. So while trust fund programs' sources of spending authority and accounting may differ from those of other federal activities, the programs affect the overall financial condition of the government in the same manner as all other programs—through the income and expenditures of the Treasury.

\* \* \* \* \* \*

Although many trust fund programs have distinct revenue sources, the income attributed to them is not all from outside the government. Much of it is intragovernmental, *resulting from credits from one Treasury account to another. . . .* The Civil Service Retirement System receives part from the outside (payments made by federal employees), but most is from an internal source (payments made by federal employers)."

Congressional Budget Office, "The Impact of Trust Fund Programs on Federal Budget Surpluses and Deficits," *Long–Range Fiscal Policy Brief,* No. 5 (issued Nov. 4, 2002), *available at* www.cbo.gov/showdoc.cfm?index=3974 & sequence=0.

F.3d 536 (4th Cir.2000) for the proposition that property obtained from defendants by an entity of the federal government—in that case the Department of Justice through administrative forfeiture—should not be offset against the restitution otherwise due from the defendants. Stewart challenges this reading of *Alalade,* pointing out that there was no evidence in that case that any of the forfeited property had been paid over to the individual victim, and that the Fourth Circuit expressly left open the question of what the result might be if that would happen. *Id.* at 541, n. 5. Stewart then cites *United States v. Smith,* 297 F.Supp.2d 69 (D.D.C.2003), to the effect that when funds forfeited to the Government have been returned to the victim, they must be offset against the amount of restitution due; otherwise there would be a double recovery. Stewart also cites *United States v. Anderson,* 85 F.Supp.2d 1084 (D.Kan.1999), in which a district court held that funds recovered in a civil suit by the Federal Government against violators of the Medicare Anti–Kickback statute should be credited against the loss incurred in a Medicare fraud. Stewart suggests that the court in *Anderson* made no distinction between the U.S. Government in general as victim as opposed to the Medicare Fund administered by the Department of Health and Human Services specifically as victim. To the extent these cases bear on the issue at all, the Court believes they favor Stewart's position.

■ Stewart also seeks to reduce his restitution obligation by the amount of the taxes he claims to have himself paid to the Federal Government, some $9,800.00. These payments, however, differ from the federal taxes withheld and paid over by OPM. These taxes were paid out of money actually received in hand by Stewart and thereafter applied by him—of his own volition—to cover taxes on the fraudulently-obtained payments. OPM and the Government lost dominion over the funds, whereas Stewart exercised active control over them. A thief is entitled to no credit for how he chooses to spend purloined money, whether he gives it all to charity or uses it to pay taxes. The federal taxes Stewart himself paid will be part of the restitution order.

In sum, the Court will exclude from the restitution amount the $74,888.65 OPM withheld (and has not already recovered) in federal taxes, but no more than that. Accordingly, the total restitution due will be $466,552.30.[7]

## V.

Having determined that the federal taxes withheld should not be counted for restitution purposes, there remains the issue of Stewart's ability to pay. 18 U.S.C. § 3663(a)(1)(B)(i)(II) requires the Court to consider the financial resources of the defendant, his financial needs, his earning ability, and such other factors as the Court deems appropriate.

Stewart is 65 years of age. His sole source of income is social security. He has extensive medical problems, having undergone surgery for cancer of the bladder and prostate. He is unable to work. Investigation has revealed no assets of value possessed by him. Several collection accounts show he has an outstanding balance of approximately $5,000. Although Stewart contends that he cannot recall what he did with the funds he illegally received—a somewhat dubious proposition—the Court accepts that none of the funds he received are any longer in existence.

On balance, therefore, the Court finds that Stewart is able to make payments

---

7.  ($541,440.95—74,888.65 = $466,552.30)

against the $466,552.30 due in restitution at the rate of $60.00 per month during the 3 years of his supervised release, commencing 30 days from his release from incarceration on his sentence of 12 months and one day.

An Amended Judgment will be ENTERED in this case.