FILED
United States Court of Appeals
Tenth Circuit

June 28, 2010

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

TOBY MARTINEZ,

      Defendant-Appellant.

No. 09-2117

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 1:07-CR-00615-WJ-1)**

---

Brian A. Pori of Inocenté P.C., Albuquerque, New Mexico, for Defendant-Appellant.

Jonathon M. Gerson, Assistant United States Attorney, (Gregory J. Fouratt, United States Attorney, and Paula G. Burnett, Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **McWILLIAMS,** and **TYMKOVICH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

---

Defendant-Appellant Toby Martinez was convicted of one count of conspiring to defraud the State of New Mexico during the construction of the Bernalillo County Metropolitan Courthouse in Albuquerque, in violation of 18 U.S.C. § 371, and two counts of mail fraud committed in furtherance of that fraudulent scheme, in violation of 18 U.S.C. §§ 1341 and 1346. The district court sentenced Martinez to 67 months' imprisonment, and pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §§ 3663A, 3664, imposed restitution in the amount of $2,710,818.66 to the State of New Mexico. On appeal, Martinez challenges the reasonableness of his sentence and several aspects of the district court's restitution order. Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we affirm.

I

The participants in the Bernalillo County Metropolitan Courthouse conspiracy defrauded the State of New Mexico through the submission of over-billings from two components of the construction of that facility: the architectural design of the courthouse and the installation of an audiovisual system. Martinez played a central role in the conspiracy: serving as the Metropolitan Court Administrator until June 2003, Martinez approved the invoices that fraudulently exaggerated the cost of services rendered. All told, the district court found that the conspiracy caused a total loss of $4,374,286.64 to the State of New Mexico.

The architectural design aspect of this conspiracy began shortly after the

2

New Mexico State Legislature enacted a bill providing for the construction of a new Bernalillo County Metropolitan Courthouse in 1998. Martinez and a judge on the Metropolitan Court consulted with Manny Aragon, who was at that time the President Pro-Tem of the New Mexico State Senate. Aragon suggested that Design Collaborative Southwest ("DCSW") be hired to complete the architectural design of the courthouse. DCSW was later awarded the contract in 1999: Marc Schiff, a DCSW partner, oversaw the contract, and Kenneth Schultz, a former mayor of Albuquerque, was hired by DCSW as a lobbyist. Aragon, Martinez, Schiff, and Schultz conspired to defraud the State of New Mexico through fraudulent over-billings. Schiff submitted inflated invoices, Martinez approved them, and cash payments were distributed among the conspirators. The district court found that the architectural design aspect of the conspiracy resulted in a total loss of $918,015.38 to the State of New Mexico. Of that amount, Martinez admitted to receiving $150,000, Schultz admitted to receiving $50,000, Schiff kept at least $136,645.38, and Aragon received at least $40,000. These distributions left an unaccounted shortfall of $541,370 that the Government could not attribute to any one of these particular individuals.

The audiovisual aspect of the conspiracy began in 2001, when Aragon and Martinez discussed the possibility of obtaining additional state funding to install an audiovisual system. Raul Parra, who was a partner in the engineering firm P2RS, "lined up the contractor and the subcontractors to perform the work on the

3

audio-visual contract." R. Vol. 1 at 206. Manuel Guara, the owner of a subcontractor company named Datcom, submitted inflated invoices to the general contractor; the general contractor incorporated Datcom's invoices into its own invoices that it submitted to Martinez for approval. Upon receiving payment, Datcom transferred funds to Parra, who then distributed the proceeds among the other conspirators. Martinez "created a shell company called Smart Solutions, using [his] wife's name, for the sole purpose of receiving proceeds of the inflated audio-visual billings." Id. at 207. When Martinez left his position as Courthouse Administrator in June 2003, he "relied upon" Michael Murphy, the owner of the company supervising the courthouse construction, to "make sure the inflated [general contractor] invoices were approved for payment." Id. Martinez promised Murphy $20,000 for his cooperation.

The district court found that the total loss to the State of New Mexico resulting from the audiovisual aspect of the conspiracy was $3,456,253.26. Of that amount, the district court found Martinez responsible for $2,019,448.66, Aragon for $609,272.32, Parra for $601,532.28, Sandra Martinez (Martinez's wife) for $106,000, Guara for $100,000, and Murphy for $20,000.

Evidence of this criminal conduct later surfaced in 2005, and in December of that year the FBI confronted Martinez about the courthouse project. Martinez, represented by counsel, gave the FBI a lengthy and detailed statement about the entire conspiracy. His assistance was substantial: Martinez alerted the FBI to the

4

architectural design aspect, which had not yet been discovered, and convinced Parra to cooperate. Shortly thereafter, Schiff, Schultz, and Guara all agreed to cooperate, and each of these co-conspirators entered into pre-indictment plea agreements.

In March 2007, a grand jury empaneled by the United States District Court for the District of New Mexico returned a multiple count indictment against Martinez and several co-conspirators. The fourth superseding indictment, returned on October 8, 2008, charged Martinez, Sandra Martinez, Parra, Aragon, and Murphy with a conspiracy to commit money laundering and mail fraud in violation of 18 U.S.C. § 371, and also alleged multiple counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, and multiple counts of money laundering in violation of 18 U.S.C. §§ 1956 and 1957. The indictment alleged that the conspiracy lasted from 1999 until January 2006, and also contained allegations of forfeiture for Martinez, Sandra Martinez, and Aragon.

As part of its pretrial pleadings, the Government filed a notice of intent pursuant to Federal Rule of Evidence 404(b) to introduce specific acts of uncharged conduct that related to two other construction projects. First, the Government sought to introduce evidence that during the earlier construction of the New Mexico Second Judicial District Courthouse, a company that Parra at least partly owned was paid for unnecessary data network design, and that there was evidence tending to show that Parra paid Aragon $50,000. Id. at 51-52.

5

Second, the Government sought to introduce evidence that during the construction of the Bernalillo County Metropolitan Detention Center, Parra convinced P2RS, DCSW, and another company that it would be beneficial to pay Aragon thousands of dollars to guarantee work on public construction contracts. Id. at 52-54. The Government argued the prior acts were relevant to show "opportunity, knowledge, intent, identity, preparation and planning, and absence of mistake . . . ." Id. at 48. The district court initially ruled that most of this evidence was admissible, but later reconsidered that ruling and excluded evidence relating to the construction of the Metropolitan Detention Center.

On October 10, 2008, Martinez pleaded guilty to the conspiracy count and to two counts of mail fraud pursuant to a cooperation agreement. In the plea agreement, the parties entered into the following stipulations to assist the district court in calculating Martinez's advisory guideline range: Martinez should be responsible for a loss amount between $1.5 and $2.5 million; Martinez was a "public official in a high-level sensitive position," and should receive a four-level enhancement under U.S.S.G. § 2C1.1(b)(3); Martinez "did not supervise the activities of his co-conspirators," and should not receive an enhancement for his role in the offense under U.S.S.G. § 3B1.1(a); Martinez should not receive an enhancement for abuse of a position of trust under U.S.S.G. § 3B1.3 because he was subject to an equivalent enhancement under U.S.S.G. § 2C1.1(b)(3). Id. at 210. Martinez reserved the right to argue that the 2000 version of the United

6

States Sentencing Guidelines should apply to his sentence, and agreed to forfeit several of his assets to the federal government. Id. at 211, 215-16.

On October 14, 2008, Parra pleaded guilty pursuant to a cooperation agreement under Federal Rule of Criminal Procedure 11(c)(1)(C) in which the parties stipulated to a maximum term of imprisonment of 71 months. Id. at 235. Parra was eventually sentenced to 46 months' imprisonment. On October 15, 2008, Aragon pleaded guilty pursuant to a plea agreement under Rule 11(c)(1)(C) in which the parties stipulated to a term of imprisonment of 67 months. Id. at 264.

Prior to Martinez's sentencing, the Government filed a motion seeking a reduction in Martinez's sentence because of his substantial assistance, and a United States Probation Officer prepared Martinez's presentence report (PSR). Using the 2008 version of the United States Sentencing Guidelines, the PSR determined Martinez's base offense level was 14 under U.S.S.G. § 2C1.1(a)(1), applied a 16-level enhancement under § 2B1.1(b)(1) because Martinez was responsible for a loss between $1.5 and $2.5 million, and applied a 4-level enhancement under § 2C1.1(b)(3). When Martinez's base offense level was adjusted three levels for acceptance of responsibility, his total offense level was 31, which when combined with Martinez's criminal history category I, produced a guideline range of 108-135 months.

Martinez filed written objections to the PSR and raised several arguments

7

concerning the reasonableness of his guideline range and the amount of restitution proposed. With respect to his guideline range, Martinez argued that the PSR failed to account for the prior conduct of his co-conspirators, and therefore did not consider Martinez as a latecomer to a conspiracy that had been initiated years earlier. Martinez also argued that applying the 2008 version of the Guidelines rather than the 2000 version violated the ex post facto clause, given the substantially higher guideline range that resulted from the application of the 2008 version. Concerning his restitution obligation, Martinez argued that he received only $155,000 from the architectural design aspect of the conspiracy, and should not be jointly and severally liable for the $541,370 of unaccounted fraudulent proceeds resulting from that aspect of the conspiracy.[1] Martinez also argued that the district court should offset any restitution obligation by the value of the property he forfeited to the federal government, by the federal and state taxes he paid on the fraudulent proceeds, and by the money he paid and loaned to co-conspirators. The Government opposed each of these arguments.

The district court conducted Martinez's sentencing hearing on April 7, 2009. During the hearing, the Government offered the testimony of FBI Special Agent Drew McCandless, who had previously testified during Aragon's

---

[1] This argument was in response to the Government's restitution argument that Martinez and his co-defendants should be jointly and severally liable for the reasonably foreseeable losses to the State of New Mexico.

sentencing hearing concerning the loss amounts attributable to each co-conspirator. During cross examination of Agent McCandless, Martinez's counsel attempted to inquire into the existence of a prior, ongoing conspiracy involving Martinez's co-conspirators, as well as any other benefit these co-conspirators received from participating in the ongoing conspiracy. The Government objected to these lines of inquiry as irrelevant, and the district court sustained the Government's objections for the most part.

In calculating Martinez's advisory guideline range, the district court concluded that it would apply the 2008 version of the Guidelines and not the 2000 version. The district court also rejected the parties' plea agreement stipulation that Martinez would not be subject to a role adjustment under U.S.S.G. § 3B1.1(a), and instead imposed a three-level enhancement for a managerial or supervisory role under U.S.S.G. § 3B1.1(b). That enhancement increased Martinez's total offense level to 34, and produced a guideline range of 151-188 months. The district court granted the Government's motion for a sentence reduction for substantial assistance, and departed downward eight offense levels, from 34 to 26, which produced a reduced guideline range of 63-78 months. The district court then sentenced Martinez to a maximum term of 60 months' imprisonment on the conspiracy count, and 67 months' imprisonment on the mail fraud counts, all terms to run concurrently. The district court acknowledged that this was the same term of imprisonment Aragon received, and the court stated that

9

it considered Martinez and Aragon to be the most culpable members of the conspiracy.

Rejecting Martinez's restitution arguments, the district court held Martinez and Aragon jointly and severally liable for the $541,370 in unaccounted fraudulent proceeds resulting from the architectural design aspect of the conspiracy.[2] Together with the $2,019,448.66 that Martinez received from the audio-visual installation, and the $150,000 that Martinez admitted to receiving from the architectural design scheme, the district court ordered that Martinez pay $2,710,818.66 in restitution to the State of New Mexico.

## II

We review a criminal defendant's sentence for reasonableness, deferring to the district court under the "familiar abuse-of-discretion standard of review." Gall v. United States, 552 U.S. 38, 46 (2007). Reasonableness review has a procedural and substantive component. United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1214 (10th Cir. 2008). Martinez argues that each component of his sentence is unreasonable, and we address each in turn.

## A

In reviewing a criminal defendant's sentence for procedural reasonableness,

---

[2] Another district judge also imposed joint and several liability on Schiff and Schultz for the $541,370 in unaccounted fraudulent proceeds. See United States v. Schiff, No. 1:07-cr-00252 (D.N.M. July 8, 2009) (Judgment); United States v. Schultz, No. 1:07-cr-00518 (D.N.M. Apr. 30, 2009) (Judgment).

we determine whether the district court committed any error in "calculating or explaining the sentence." Id. Martinez argues that the district court committed two procedural errors: first, the district court erred in using the 2008 version of the Guidelines to calculate Martinez's advisory guideline range; second, the district court erred in denying Martinez the opportunity to present certain evidence during his sentencing hearing. As to his first challenge, "[w]e review the district court's legal conclusions regarding the Guidelines de novo . . . ." United States v. Hamilton, 587 F.3d 1199, 1219 (10th Cir. 2009). As to his second challenge, "[w]e review the exclusion of sentencing evidence for abuse of discretion." United States v. Mitchell, 366 F.3d 376, 379 (5th Cir. 2004) (per curiam).

Martinez argues that the district court's application of the 2008 version of the Guidelines "dramatically increased the base offense level for [his] offense in violation of the ex post facto clause inherent in the Due Process Clause of the Fifth Amendment." Aplt. Br. at 31 (emphasis removed). Martinez also contends that applying the 2008 version was "simply not reasonable in light of the facts of the case," id. at 31, because his total offense level would have been lower under the version of the Guidelines in effect "[a]t the time the conspiracy began," id. at 30.

A district court "shall use the Guidelines Manual in effect on the date that the defendant is sentenced," unless using that version of the Guidelines Manual

11

would violate the ex post facto clause of the United States Constitution. U.S.S.G. § 1B1.11(a), (b)(1). A district court violates the ex post facto clause when it "applies a guideline to an event occurring before its enactment, and the application of that guideline disadvantages the defendant by altering the definition of criminal conduct or increasing the punishment for the crime." United States v. Foote, 413 F.3d 1240, 1249 (10th Cir. 2005) (citations and quotations omitted). In such a case, the district court instead must use "the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(b)(1). "[T]he last date of the offense of conviction is the controlling date for ex post facto purposes." U.S.S.G. § 1B1.11(b)(1), app. n.2 (underlining removed).

Applying these principles, we conclude that the district court did not err in applying the 2008 version of the Guidelines. Martinez confessed to his involvement in the courthouse conspiracy in December 2005, and pleaded guilty to his involvement in a conspiracy that continued from 1999 until January 2006. Given that the 2005 version of the Guidelines became effective on November 1, 2005, we agree with the district court that "if there was an ex post facto issue, the guidelines that would be used would either be the 2005 version or the 2004 version . . . ."[3] R. Vol. 4 at 174. In those versions, we have reviewed the

_____

[3] We focus on this time frame, in spite of Martinez's guilty plea to two

(continued...)

12

pertinent guideline provisions that would be used to calculate Martinez's advisory guideline range, and conclude the 2008 version would not produce a different result.[4]

Martinez's second argument is that the district court abused its discretion in excluding "evidence of the co-Defendant's relevant conduct in an effort to show that he was not an organizer, leader or manager and that he did not receive the greatest financial benefit . . . ." Aplt. Br. at 23. During cross-examination of Agent McCandless at the sentencing hearing, Martinez asked if the agent was aware that "since the early 1990s, many of the codefendants have been involved in a common scheme to pay Senator Aragon in exchange for receiving influence in bidding on public construction projects . . . ." R. Vol. 4 at 23. The Government objected to this line of inquiry as irrelevant, and the district court

<hr>

[3](...continued)
counts of mail fraud which allegedly occurred in June 2002 and June 2003. The Guidelines provide that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3); see United States v. Sullivan, 255 F.3d 1256, 1261-63 (10th Cir. 2001) (concluding that U.S.S.G. § 1B1.11(b)(3) does not violate the ex post facto clause of the United States Constitution).

[4] We also reject Martinez's remaining argument on this issue—that the district court erred in applying § 1B1.11 because it resulted in "dramatically increased punishment" that "was simply not reasonable." Aplt. Br. at 31. A correctly calculated guideline range is "the 'starting point and the initial benchmark' for any sentencing decision," United States v. Todd, 515 F.3d 1128, 1134 (10th Cir. 2007) (quoting Gall, 552 U.S. at 49), and as we have already discussed, the district court did not err in applying § 1B1.11.

13

sustained the Government's objection, explaining its reasoning as follows:

> I don't consider it relevant for purposes of Mr. Martinez's sentencing to get into allegations of relevant conduct, and none of it is charged in the Indictment as to other defendants, and none of it is addressed or raised in any of the presentence reports. It's obvious that this case, in terms of what was presented to the grand jury and the subsequent superseding indictments, has always focused on the Metropolitan Courthouse. The issue of relevant conduct did come up under Evidence Rule 404(b) in terms of other alleged acts, but none of that evidence was ever presented, because we didn't have a trial.

Id. at 32. Later during cross-examination, Martinez asked Agent McCandless about "the total values of the contracts Mr. Parra's company, P2RS, received for the construction of the Metropolitan Courthouse." Id. at 62. Although P2RS was not involved in the two aspects of the conspiracy, Martinez's theory was that because Parra said "every job his company got, he got because of Senator Aragon," any profit that P2RS earned from its Metropolitan courthouse contracts should be factored into the gain Parra received from the conspiracy. Id. at 63. Again the Government objected, arguing this line of inquiry was irrelevant. The district court permitted a limited exploration of this line of inquiry before eventually concluding that it was irrelevant for purposes of sentencing Martinez. Id. at 66-68.

Although the Government objected to Martinez's subsequent attempts to pursue these lines of inquiry, see, e.g., id. at 77, 90, 93, 97, Martinez proffered the ultimate facts that he was trying to prove just before allocution:

> [W]ith respect to other activity by similarly situated defendants,

14

we would submit that, if we were able to present evidence, we would show that Michael Murphy received [$1,229,993.93] for his construction contract on the Metropolitan Court.

We would show that Raul Parra made $1,214,000 for his work in the Metropolitan Detention Center, the courthouse mechanical engineering, and parking lot portions of the contract.

We would show that Marc Schiff made $9,384,801.45 in contracts for his company, DCSW, in the Metropolitan Detention Center and the courthouse and the Metropolitan Courthouse parking structure.

And we would show that Ken Schultz was paid, in the period from 2000 to 2004, [$336,374.53] for his lobbying contract with DCSW.[5]

Id. at 203. In response to this proffer, the district court reemphasized its prior ruling, explaining that "as far as any allegations of other corruption on any other public projects, no defendant in this case received any type of enhancement under the guidelines for relevant conduct," and that the court's "focus has been on each defendant's culpability regarding the design and construction of the Metropolitan Courthouse, and what other defendants may or may have not done regarding other projects is simply not relevant for the purposes of this sentencing or the sentencing of any other defendant in this case." Id. at 204-05.

On appeal, Martinez argues the district court abused its discretion in excluding "evidence to show that the conspiracy involving his co-Defendants began in the early 1990s and formed part of a common scheme or plan in which Mr. Martinez played only a minor role," and in excluding "evidence to refute the

---

[5] Within each of these amounts, Martinez did not differentiate between the portion representing fraudulent proceeds, and the portion representing revenues for services actually rendered.

allegation in his [PSR] that he had received the highest gross proceeds of any co-conspirators by pointing to the personal and corporate benefits received by his co-Defendants during their ongoing criminal conspiracies in public construction projects."  Aplt. Reply at 7.  He primarily relies on 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."[6]

We do not view 18 U.S.C. § 3661 as dispositive.  The statutory language of § 3661 appears to focus on the individual circumstances of the person being sentenced; here, Martinez sought to introduce "information concerning the background, character, and conduct" of co-conspirators for comparison purposes.  But on a more fundamental level, § 3661 "codifies the longstanding principle that sentencing courts have broad discretion to consider various kinds of information." United States v. Watts, 519 U.S. 148, 151 (1997) (per curiam); see also United

---

[6] Martinez also points to U.S.S.G. § 6A1.3(a), which permits a district court to consider "relevant evidence without regard to its admissibility" in "resolving any dispute concerning a factor important to the sentencing determination."  This Guideline provision is unhelpful because the district court excluded the evidence on relevancy grounds.

Martinez also argues the exclusion of this evidence caused the district court to "arrive[] at [an] advisory Guideline level which was based on clearly erroneous factual findings."  Aplt. Reply at 6.  But Martinez does not identify exactly how the exclusion of this evidence resulted in an improperly calculated offense level.

16

States v. Hooks, 551 F.3d 1205, 1217 (10th Cir. 2009) ("With few limitations, a court has almost unlimited discretion in determining what information it will hear and rely upon in imposing a sentence under the advisory sentencing guidelines." (citation, quotation and alteration omitted)).  Simply put, in sentencing one co-defendant convicted for his participation in a highly-publicized and immense conspiracy to defraud the State of New Mexico of millions of dollars, the district court refused to delve into prior co-conspirator conduct because that conduct was never alleged in an indictment and was never used to calculate the advisory guideline ranges of other co-defendants.  The district court did not abuse its discretion by limiting the evidence it considered.  By its ruling, the district court refused to embark upon an "apples and oranges" comparison between the fraudulent proceeds Martinez gained from this conspiracy and the contract revenues for services rendered that other co-conspirators previously gained from allegedly bribing Aragon.  We find no procedural error.[7]

---

[7] We additionally reject Martinez's characterization of the evidence he sought to present at sentencing as relevant conduct.  Under the Guidelines, relevant conduct is the range of conduct attributable to a defendant for purposes of calculating his or her guideline range.  See U.S.S.G. § 1B1.3.  Even assuming Martinez was indeed a latecomer to an ongoing conspiracy, the prior co-conspirator conduct he sought to introduce would not affect the calculation of his offense level.  The Guidelines clearly state that "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct."  U.S.S.G. § 1B1.3 app. n.2.

B

We employ an abuse of discretion standard in reviewing a criminal defendant's sentence for substantive reasonableness. United States v. Smart, 518 F.3d 800, 806 (10th Cir. 2008). We "afford substantial deference to [the] district court[]," id., and determine "whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)," United States v. Friedman, 554 F.3d 1301, 1307 (10th Cir. 2009) (quotation and citation omitted). Because substantive reasonableness "contemplates a range, not a point," United States v. Omole, 523 F.3d 691, 698 (7th Cir. 2008) (citations and quotations omitted), in this arena we recognize a range of "rationally available choices" that "the facts and law at issue can fairly support," United States v. McComb, 519 F.3d 1049, 1053 (10th Cir. 2007). Even if we might reasonably conclude that a different sentence was also appropriate, that is not a sufficient basis for reversal. Gall, 552 U.S. at 51. We reverse only when the district court "renders a judgment that is arbitrary, capricious, whimsical or manifestly unreasonable." Friedman, 554 F.3d at 1307 (citation and quotation omitted).

Martinez's PSR calculated his advisory guideline range at 108-135 months, which resulted from a total offense level of 31 and a criminal history category I. At sentencing, the district court imposed a three-level adjustment for Martinez's role as a "manager or supervisor" under U.S.S.G. § 3B1.1(b), increasing

18

Martinez's total offense level to 34, and yielding an increased advisory guideline range of 151-181 months. The district court then granted the Government's motion for substantial assistance and downwardly departed eight levels, decreasing Martinez's total offense level to 26 and reducing his advisory guideline range to 63-78 months. In sentencing Martinez to 60 months' imprisonment on the conspiracy count and to 67 months' imprisonment on the mail fraud counts, with all terms of imprisonment to run concurrently, the district court explained

> [T]hat is the same term of incarceration that was imposed on Mr. Aragon, and as I noted earlier, I consider the two leaders or the two individuals who were the most culpable in this conspiracy to be Mr. Aragon and Mr. Martinez, and that's due in large part to the roles they played, one being an elected public official and, in Mr. Martinez's case, the other being a public official in a high-ranking capacity as the administrator of the Metropolitan Court.

R. Vol. 4 at 222. Martinez argued that his sentence was unfairly severe because it improperly equated Martinez's conduct with Aragon's. Martinez argued that the district court's acceptance of Aragon's Rule 11(c)(1)(C) sentence of 67 months' imprisonment was an implicit determination that 67 months' imprisonment was a "just and reasonable sentence" for Aragon, and it was therefore unfair to impose an identical sentence on Martinez given that Aragon did not cooperate with the Government, was "the last defendant to plead," and "actively obstructed justice." Id. at 233-34. The district court considered this argument and rejected it. The district court stated that it "did take into account the sentencing factors of 18

19

U.S.C. 3553(a)(1) through (7)," explained that it did "not consider there to be unwarranted sentencing disparities in this case particularly with respect to Factor No. 6 of the sentencing factors," and further emphasized that

> The fact that the government, in the negotiation with Mr. Aragon, agreed on a specific sentence of 67 months, again, some of that, there are factors that go into those type of negotiations in terms of age and health of the defendant. There were some issues relating to Mr. Aragon's health and his age in terms of that he's older than Defendant Martinez. Those type of factors can be considered.
> . . . .
> . . . I guess they're intangible factors, but oftentimes, plea negotiations are on a case-by-case and oftentimes defendant-by-defendant basis, and not all defendants are in the same status in terms of considerations that the government goes into when plea negotiations are done.

Id. at 234-36.

Martinez argues his sentence is substantively unreasonable because of co-conspirator disparity. Martinez contends that there are unwarranted sentencing disparities between the sentence he received and the sentences that Aragon, Parra, and Schiff each received. He primarily invites us to compare his sentence to Aragon's sentence: using Aragon's Rule 11(c)(1)(C) sentence of 67 months' imprisonment as a benchmark, Martinez contends that "[i]f one defendant provided substantial assistance and the other defendant actively obstructed justice and yet the two received the same sentence, unwarranted sentencing disparities are obvious." Aplt. Br. at 35.

One factor that a district court must consider in imposing an appropriate

20

sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . ." 18 U.S.C. § 3553(a)(6). On its face, this factor requires a district court "to take into account only disparities *nationwide* among defendants with similar records and Guideline calculations." United States v. Verdin-Garcia, 516 F.3d 884, 899 (10th Cir. 2008) (emphasis in original); see also United States v. Ivory, 532 F.3d 1095, 1107 (10th Cir. 2008) ("§ 3553(a)(6) . . . looks to uniformity on a national scale"). Recently in Gall, the Supreme Court implicitly approved of a district court's consideration of "unwarranted *similarities* among other co-conspirators who were not similarly situated." 552 U.S. at 55 (emphasis added). We have interpreted Gall to conclude that although § 3553(a) does not require a consideration of co-defendant disparity, United States v. Rojas, 531 F.3d 1203, 1210 (10th Cir. 2008), it is not improper for a district court to undertake such a comparison, Smart, 518 F.3d at 804. Nonetheless, "disparate sentences are allowed where the disparity is explicable by the facts on the record." United States v. Davis, 437 F.3d 989, 997 (10th Cir. 2006) (quotation and citations omitted). And § 3553(a)(6)'s consideration of unwarranted sentence disparities is but one factor that a district court must balance against the other § 3553(a) factors in arriving at an appropriate sentence. United States v. Charles, 467 F.3d 828, 833 (3d Cir. 2006).

We reject Martinez's argument of co-conspirator disparity because any

21

disparity between his and Aragon's identical terms of imprisonment is explained by their different plea agreements: whereas Aragon's Rule 11(c)(1)(C) agreement stipulated to 67 months' imprisonment, Martinez's agreement gave the district court ultimate discretion to determine his sentence. We also reject Martinez's argument because it essentially urges this court to re-sentence him, giving greater weight to the existence of co-conspirator disparities than did the district court. That is not our role. The weight a district court assigns to each of the § 3553(a) factors, and the balance it ultimately assesses among them, is not subject to our de novo review. Smart, 518 F.3d at 808. "[A]s long as the balance struck by the district court among the factors set out in § 3553(a) is not arbitrary, capricious, or manifestly unreasonable, we must defer to that decision even if we would not have struck the same balance in the first instance." United States v. Sells, 541 F.3d 1227, 1239 (10th Cir. 2008). Here, the district court credited Martinez's substantial assistance with a downward departure of eight levels, but imposed a within-Guidelines sentence that was identical to Aragon's because those two defendants played commensurate roles in the conspiracy. To the extent these identical terms of imprisonment created a disparity, the district court did not consider it to be unwarranted. We cannot say that the balance the district court struck among the § 3553(a) factors was arbitrary, capricious, or manifestly unreasonable. Martinez's sentence of 67 months' imprisonment "falls within the realm of . . . rationally available choices," McComb, 519 F.3d at 1053, and we

22

affirm the sentence imposed.[8]

### III

Martinez also argues that the district court erred in determining the amount of restitution he is to pay to the State of New Mexico under the MVRA. He maintains that the district court erred in not offsetting his restitution obligation by the value of his property subject to criminal forfeiture, in not offsetting his restitution obligation by the amount of federal and state income taxes paid on his share of fraudulent proceeds, and in finding Martinez jointly and severally liable for the $541,370 of unaccounted fraudulent proceeds resulting from the architectural design aspect of the conspiracy. "We review the district court's

---

[8] We also reject the argument that Martinez, Schiff, and Parra are similarly situated. The comparison with Schiff is unavailing because Schiff was sentenced after Martinez and by a different district court judge. The comparison with Parra is without merit because Martinez and Parra played different roles in the conspiracy and received different amounts of fraudulent proceeds. We also reject the argument that Martinez and Parra are similarly situated because Parra "deducted more than $1.8 million in fraudulent payments [to Smart Solutions] from his income taxes." Aplt. Br. at 36. Martinez has never demonstrated the extent to which Parra's tax deductions should be considered as fraudulent gain. The testimony that Martinez elicited from Agent McCandless at the sentencing hearing only demonstrated that the agent did not incorporate the value of any tax savings into his calculation of each co-conspirator's fraudulent gain, was not aware of the precise amount of the tax savings resulting from Parra's deductions, and did not necessarily believe Parra's deductions were illegal. See R. Vol. 4 at 70-71 ("I'm not an IRS agent, but the way I interpret the way [Parra] did that, even though the activity was illegal, claiming those expenses is not if they're related to the income."). Moreover, the broader point is that the district court heard this testimony and concluded that there was no unwarranted sentencing disparity here, a conclusion we have already determined was not an abuse of discretion.

23

application of the MVRA *de novo*, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008).

A

Martinez argues that the district court erred by not offsetting his restitution obligation to the State of New Mexico by the value of the property he agreed to forfeit to the federal government. Whether the MVRA permits such an offset is a question of law that we review de novo. United States v. Ruff, 420 F.3d 772, 773 (8th Cir. 2005).

Prior to the enactment of the MVRA, the imposition of restitution was a discretionary decision under the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291, § 5, 96 Stat. 1248, 1253-55 (1982) (codified as amended at 18 U.S.C. §§ 3663, 3664). See 18 U.S.C. § 3663(a) (1994); United States v. Alalade, 204 F.3d 536, 539 (4th Cir. 2000). In deciding whether to impose restitution, and in determining the amount of such restitution, the VWPA directed the district court to consider the "amount of loss sustained by a victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deem[ed] appropriate." 18 U.S.C. § 3664(a) (1994).

The MVRA alters this framework in two important ways. First, as its title

24

indicates, the MVRA requires the mandatory imposition of restitution for certain

categories of crimes.  See 18 U.S.C. § 3663A(c)(1)(A)(ii) (including "offense[s]

against property" under Title 18, "including any offense committed by fraud or

deceit").  For these specified categories of crimes, the MVRA requires that a

district court "shall order, in addition to . . . any other penalty authorized by law,

that the defendant make restitution to the victim of the offense . . . ."  18 U.S.C. §

3663A(a)(1).  A "victim" under the MVRA is "a person directly and proximately

harmed as a result of the commission of an offense for which restitution may be

ordered . . . ."  Id. § 3663A(a)(2); see United States v. Quarrell, 310 F.3d 664,

677 (10th Cir. 2002) ("[T]he government can be a 'victim' under the MVRA.").

Second, the MVRA "significantly limit[s]" a sentencing court's discretion

in determining the amount of restitution.  United States v. Bright, 353 F.3d 1114,

1121 (9th Cir. 2004).  In contrast to the discretionary provisions of the VWPA,

the MVRA requires that "[i]n each order of restitution, the court shall order

restitution to each victim in the *full amount of each victim's losses* as determined

by the court and *without consideration of the economic circumstances of the

defendant*."  18 U.S.C. § 3664(f)(1)(A) (emphasis added).[9]  In addition, "[i]n no

case shall the fact that a victim has received or is entitled to receive compensation

with respect to a loss from insurance or any other source be considered in

---

[9] Any order of restitution under the MVRA must be imposed in accordance
with the procedures of 18 U.S.C. § 3664.  18 U.S.C. § 3663A(d).

25

determining the amount of restitution." Id. § 3664(f)(1)(B). Under the MVRA, a district court considers the defendant's financial circumstances only in specifying the manner and schedule of payments. See id. § 3664(f)(2).

The MVRA contains two provisions "particularly relevant to the issue of offsets." Bright, 353 F.3d at 1122. One provision states that "[i]f a victim has received compensation from insurance or any other source with respect to a loss," the district court shall order that restitution be paid to that source after the victim has received full payment. 18 U.S.C. § 3664(j)(1). The other provision states that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in–(A) any Federal civil proceeding; and (B) any State civil proceeding, to the extent provided by the law of the State." Id. § 3664(j)(2).

Based on this statutory framework, the Fourth, Eighth, and Ninth Circuits have determined that the MVRA prohibits a district court from considering the value of a defendant's forfeited property in ordering restitution pursuant to § 3664(f)(1)(A)-(B). Bright, 353 F.3d at 1122-23; Alalade, 204 F.3d at 540; see United States v. McCracken, 487 F.3d 1125, 1128-29 (8th Cir. 2007) ("[T]he district court has no discretion to adjust the total restitution due to the victim based on funds held by law enforcement."); Ruff, 420 F.3d at 774 (concluding that § 3664(f)(1)(B) required the district court to order restitution in the full amount that was stipulated in the plea agreement); see also United States v.

26

Taylor, 582 F.3d 558, 565-68 (5th Cir. 2009) (per curiam) (canvassing these decisions and concluding that no offset was appropriate because there was no evidence the victims had received any forfeited funds).

In Alalade, the Fourth Circuit concluded that the "plain language of the MVRA did not grant the district court discretion to reduce the amount of restitution required to be ordered by an amount equal to the value of the property" subject to administrative forfeiture.  204 F.3d at 540.  Comparing the VWPA's language with the MVRA's, the court concluded that "Congress completely deleted the language of the VWPA affording the district court discretion . . . to consider any factor it deemed appropriate in determining the amount of restitution . . . ."  Id.  Also critical to the court's analysis was § 3664(f)(1)(B): if a district court could not reduce a defendant's restitution obligation by the amount of third-party compensation the victim had received prior to the entry of the restitution order, "it would be nonsensical for the district court to have discretion to reduce the amount of restitution by the value of property seized from the defendant and retained by the government in administrative forfeiture . . . ."  Id.; see United States v. Rollins, 65 F. App'x 215, 216 (10th Cir. 2003) (citing Alalade in concluding that the MVRA did not permit the district court to offset a defendant's restitution obligation to bank robbery victims by the amount of funds retained by the State of Texas).

Following Alalade, the Ninth Circuit concluded in Bright that it was "clear"

27

from the MVRA's plain language that "the district court was required in the first instance to set the amount of [the defendant's] restitution obligation based on his victims' collective losses and without regard to forfeited funds – whether or not any of those funds had been turned over to the victims."  353 F.3d at 1122. Offsets against the full amount of restitution were "handled separately as potential credits against the defendant's restitution obligation – not as reductions in the amount of that obligation in the first instance."  Id. at 1121.

Neither Alalade nor Bright addressed whether a defendant's restitution obligation should be offset by a victim's receipt of forfeited property.  Alalade, 204 F.3d at 541 n.5; Bright, 353 F.3d at 1122-23.  In particular, Bright declined to address the issue because the forfeiture funds in that case were not available for the victims, and "the MVRA provisions . . . make clear that funds the victims have *not* received cannot reduce or offset the amount of losses the defendant is required to pay."  353 F.3d at 1122-23 (emphasis in original).  However, the Eighth Circuit addressed this unanswered question in Ruff, a case in which a defendant stipulated in his plea agreement to provide restitution to a state agency for money spent investigating his criminal activities.[10]  420 F.3d at 773.  The defendant contended that the agency had received or was going to receive

---

[10] The MVRA provides that "[t]he court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense."  18 U.S.C. § 3663A(a)(3).

28

proceeds from the administrative forfeiture of his property. The Eighth Circuit doubted whether proceeds recovered from administrative forfeiture would qualify as "compensatory damages" that could be credited against the defendant's restitution obligation pursuant to § 3664(j)(2), but nonetheless concluded that the "bar against double recovery should . . . preclude the [agency] from recovering an amount greater than the agency expended . . . ." Id. at 775. The Eighth Circuit directed the district court on remand to "modify the restitution order to prevent double recovery" by the agency if Ruff could establish that the agency received any forfeiture funds. Id. at 776; see also McCracken, 487 F.3d at 1129 (noting the Government's representation that forfeited funds from a bank robbery would be delivered to the victim, "at which time the court presumably will adjust" the restitution obligation); United States v. Smith, 297 F. Supp. 2d 69, 72-73 (D.D.C. 2003) (offsetting a defendant's restitution obligation by the amount of forfeited funds the federal government remitted to the victim).

Convinced by the reasoning of our sister circuits, we conclude that the plain language of the MVRA, in particular § 3664(f)(1)(A)-(B), prohibits a district court from considering the value of defendant's forfeited property in initially determining the full amount of restitution. Whether a defendant's restitution obligation may be offset by the value of forfeited property a victim has received is an issue we need not decide. Unlike the defendant in Ruff, Martinez does not contend that the State of New Mexico has received or will receive the

29

proceeds of his forfeited property; he only argues the federal government "is easily in a position" to distribute them. Aplt. Br. at 45-46. "[T]he MVRA provisions . . . make clear that funds the victims have *not* received cannot reduce or offset the amount of losses the defendant is required to repay." Bright, 353 F.3d at 1123 (emphasis in original). Accordingly, we reject Martinez's argument that his restitution obligation to the State of New Mexico should be offset by the value of property he agreed to forfeit to the federal government.

B

Martinez next argues that the district court erred by not offsetting his restitution obligation by the federal and state income taxes that his shell corporation, Smart Solutions, paid on his share of fraudulent proceeds. Whether the MVRA allows for such an offset is a question of law that we review de novo. See United States v. Serawop, 505 F.3d 1112, 1117 (10th Cir. 2007) ("We consider de novo the district court's application of the MVRA . . . .").

At oral argument, Martinez acknowledged that these arguments, though theoretically conceivable, were difficult to make. Given the limited briefing Martinez has devoted to these arguments, we will not labor over them. We reject the argument that Martinez should receive an offset for his payment of federal income taxes: the victim in this case is the State of New Mexico, not the federal government, and as the district court recognized, Martinez's assertion that "New Mexico receives two dollars in federal tax dollars for every dollar its citizens

30

send to Washington" is without merit. Aplt. Br. at 44-45. We also reject the argument that Martinez should receive an offset for his payment of state income tax because the case he relies upon, United States v. Stewart, 321 F. Supp. 2d 652 (D. Md. 2004), does not support his argument. In Stewart, a defendant was convicted for conspiring to convert survivor benefits from the Office of Personnel Management. The district court ordered restitution to the United States, but offset the defendant's restitution obligation by the amount of income taxes the federal government withheld from the benefit payments because "the Government always had use of the withheld federal taxes and to that extent it was never injured." Id. at 656. The court did not offset the defendant's restitution obligation by the amount of federal income taxes the defendant "claim[ed] to have himself paid to the Federal Government," reasoning that "[a] thief is entitled to no credit for how he chooses to spend purloined money, whether he gives it all to charity or uses it to pay taxes." Id. at 657. We reject the argument that Martinez should have received an offset for his payment of income taxes.

## C

Finally, Martinez challenges the district court's imposition of joint and several liability for the $541,370 in unaccounted fraudulent proceeds resulting from the architectural design aspect of the conspiracy. In this case, the district court imposed joint and several liability upon Aragon and Martinez for these unaccounted fraudulent proceeds. In separate proceedings, joint and several

31

liability for these proceeds was also imposed on Schiff and Schultz.

The MVRA affords district courts the discretion to apportion restitution among co-defendants that contribute to a victim's loss:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h); see United States v. Booth, 309 F.3d 566, 576 (9th Cir. 2002) ("The court had the discretion to apportion the [restitution] total, but was not required to do so."). We review the district court's imposition of joint and several liability for an abuse of discretion. United States v. Sensmeier, 361 F.3d 982, 990 (7th Cir. 2004).

During Martinez's sentencing hearing, Agent McCandless testified that the $541,370 of unaccounted fraudulent proceeds was deposited into Schiff's bank account, from which Schiff subsequently made large cash withdrawals. R. Vol. 4 at 107. Agent McCandless also testified that apart from how much some of the co-conspirators admitted to receiving, "or how much you can arrive at that they actually received based upon their testimony and agreement," there was essentially no credible way of determining how these fraudulent proceeds were ultimately distributed. Id. at 76-79. Largely relying on this testimony, Martinez asserts that the district court erred in imposing joint and several liability "based on nothing more credible than a guess." Aplt. Br. at 42.

32

Contrary to Martinez's contention, the district court's joint and several liability ruling is supported. Martinez admitted in his plea agreement that the "cash payments" from this aspect of the conspiracy "were, by and large, the proceeds of false invoices submitted by Schiff and approved for payment by me," which were then "forwarded by my office along with payment vouchers to the New Mexico Department of Finance and Administration." R. Vol. 1 at 205. According to Agent McCandless, Martinez may have been unaware of the full magnitude of the architectural design aspect of the conspiracy, but he certainly understood how it operated.

> I think Mr. Martinez disagrees with knowing about the full scope of $918,000. And in fairness to Mr. Martinez, . . . I agree that there's a good likelihood that he didn't know that there were $918,000 worth of fraudulent invoices sent, and probably the same thing for Mr. Schultz. I do think that they knew that this was going on, and I think it's clear, if you look at the schedule and the cash withdrawals done by Mr. Schiff, that they received a benefit on several of the transactions involving the fraudulent invoices.
> It's clear that Mr. Schultz has said that – or has told us that the reimbursables, as he described these amounts, was an idea that came from Mr. Martinez, not from Mr. Schiff. So I think Mr. Martinez had that idea to do this, maybe not to the magnitude of $918,000, but I think it was he was definitely part of it.

R. Vol. 4 at 105-06. Finally, Agent McCandless testified that "all this money [relating to the architectural design aspect] was actually approved during [Martinez's] term as court administrator, so he would have pretty good knowledge of these invoices coming in . . . ." Id. at 109; see also R. Vol. 1 at 493. In sum, the evidence shows that Martinez's contribution was crucial to the success of the

33

entire architectural scheme, and therefore the district court did not abuse its discretion in finding Martinez jointly and severally liable for the $541,370 of unaccounted fraudulent proceeds.

Martinez cites several of our decisions discussing the loss calculation rubric under the MVRA. Those decisions are not relevant to the issues presented in this appeal because Martinez does not dispute the district court's determination of the total loss amount. His argument concerns the district court's apportionment of that amount, and on this point the Fourth Circuit's decision in United States v. Newsome, 322 F.3d 328 (4th Cir. 2003), is illustrative. In that case, a defendant was a latecomer to a conspiracy to steal timber. For his relevant conduct under the sentencing guidelines, the district court calculated the loss attributable to the conspiracy during the few months the defendant was a member; for MVRA restitution, the district court found the defendant, along with his co-conspirators, jointly and severally liable for the entire loss that the conspiracy caused. The Fourth Circuit affirmed because the MVRA's statutory language focuses on the "'offense of conviction' when describing the losses subject to a restitution order." Id. at 341. Thus, under the Fourth Circuit's interpretation of the MVRA, "each member of a conspiracy that in turn causes property loss to a victim is responsible for the loss caused *by the offense*." Id. (emphasis in original). Here, given Martinez's extensive involvement in the architectural design aspect of the conspiracy, we need not definitively adopt the Fourth

34

Circuit's interpretation of the MVRA to resolve the issues presented in this appeal. Rather, we simply recognize <u>Newsome</u> as additional support for the district court's imposition of joint and several liability on Martinez for the $541,370 in unaccounted fraudulent proceeds.

IV

The judgment of the district court is AFFIRMED.